THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK v. MOLLIE C. HAYWARD ET AL.

No. 523.

1. **Life Insurance Policy—Proof of Suicide—Evidence Held Sufficient.**

For circumstantial evidence in an action upon a life insurance policy held sufficient to show that the insured came to his death from a dose of morphine administered by himself with suicidal intent, and which did not warrant the court in submitting to the jury the issue of accident or mistake in taking the morphine, see the opinion.

2. **Same—Opinion of Witness.**

A witness in reply to a question whether or not the insured, "from his conduct and his action in your presence the last time you saw him conscious, did or said anything indicating an intention or desire on his part to take his own life," answered: "There was nothing to indicate that he had the least intention of taking his own life." Held, inadmissible, as being merely the opinion of the witness.

APPEAL from Harris.   Tried below before Hon. S. H. BRASHEAR.

*Clarence H. Miller* and *Fisher & Townes,* for appellant.—1.   The verdict of the jury was wholly unsupported by the evidence, in that defendant established by the manifest weight of the evidence that Richard Hayward did die by his own act within two years from the date of the issue of the policy.   Aspley v. Thomas, 17 Texas, 220;  Rowe v. Collier, 25 Texas Sup., 252;  Zapp v. Michaelis, 58 Texas, 270;  Willis v. Lewis, 28 Texas, 191;  Taylor v. Ashley, 15 Texas, 50;  Murphy v. Crain, 12 Texas, 297;  Redus v. Burnet, 59 Texas, 576;  Railway v. Wallace, 65 Texas, 568;  Railway  v. Gordon, 70 Texas, 83;  David v. Edgar, 5 Texas, 492;  Moore v. Anderson, 30 Texas, 224;  64 Texas, 460;  1 App. C. C., secs. 861, 1029, 1155, 995;  2 App. C. C., sec. 761.

2.   The question whether in any given case a death is or is not the result is a fact for the finding of the jury.   "A witness can not give his opinion as to the motives by which another person has been actuated. Motives are inferences from conduct.   The facts from which the inferences are to be drawn are to be detailed by the witnesses; for the jury the work of inference is to be reserved.   Cooke on Life Ins., sec. 44;  1

Whart. Ev., secs. 508-515; Greenl. Ev., sec. 441; McKay v. Overton, 65 Texas, 82; Shelley v. City of Austin, 12 S. W. Rep., 754; Cooper v. State, 23 Texas, 331; Haynie v. Baylor, 18 Texas, 509.

*Kittrell & Allen*, for appellees.—1. The real question in this case is, when reduced to its last and logical analysis, if the insured committed suicide (which, we aver, has not been shown), did he do so in the ordinary acceptance of that term? If a man kills himself, the act, however done, is suicide, i. e., he takes his own life; but when we use the term "suicide," we mean, in common acceptation, that the act was done in a state of mind capable of contemplating the moral character and consequences of the act, and that it was done intentionally. Manifestly, if not so done, or if done accidentally, it is not suicide in the sense that it will relieve the insurer from liability; and the presumption is against suicide. These propositions are settled by high judicial authority. See Insurance Co. v. McConkey, 127 U. S., 667, quoted and approved in Ingersoll v. Knights of Golden Circle, 47 Fed. Rep., 272-6.

2. Where a witness has, upon full direct and cross interrogation, stated fully the facts within his knowledge, as has Steadman in his deposition, and it being manifest that the testimony of the witness, upon a differently framed interrogatory, would be substantially the same, the admission of the evidence, even if a technical error, is harmless error, and does not warrant the reversal of the case. Beauchamp v. Railway, 56 Texas, 243; Nicholson v. Horton, 23 Texas, 47; Morrison v. Loflin, 44 Texas, 17; Atkinson v. Wilson, 31 Texas, 643; Willis v. Chambers, 8 Texas, 150; Frear v. Sweet, 118 N. Y., 454-460; 85 N. Y., 413-417.

PLEASANTS, ASSOCIATE JUSTICE.—The statement of the nature and result of this suit is thus given by the appellant with the approval of appellees:

Mollie C. Hayward sued appellant on a policy of insurance issued by it in her favor upon the life of her late husband, Richard Hayward. During the trial of the case, while testimony was being introduced, Mrs. Hayward suddenly died, leaving several minor children surviving her. Dr. W. H. Beasley was thereupon appointed temporary administrator of her estate for the purpose of prosecuting this suit, and, by agreement of the defendant, the administrator was made a party, and the trial proceeded with. Appellant, by answer, interposed general demurrer, general denial and special defense that Richard Hayward committed suicide, contrary to the express provisions of the contract. Before the trial commenced, defendant admitted of record that the plaintiff had a good cause of action as set forth in her petition, except as it might be defeated by the matters of defense to be established on the trial. The trial before a court and jury resulted in a verdict and judgment for plaintiffs for $10,279.20 and costs. Motion for new trial was overruled, notice of appeal given, appeal bond filed, and the cause is now before this court for revision.

As is seen from this statement, defendant admitted that the plaintiff had a good cause of action, unless defeated by proof of the matters set up in defense to the suit, and the verdict and judgment should therefore be affirmed, if the defendant has failed to establish by a clear preponderance of the evidence, that Richard Hayward committed suicide, contrary to the express provisions of the contract upon which the plaintiff's suit is based. The contention of the appellee is, that it cannot be determined from the facts with that degree of certainty which the law requires whether Richard Hayward died from apoplexy, or from accidental poisoning by morphine, and, further, that the evidence repels the conclusion that he committed suicide. The appellant's theory is that the deceased came to his death from a dose of morphine administered by himself with suicidal intent. The evidence is circumstantial, and the burthen is on appellant to establish his theory by induction; in other words, he must, from the facts proved, demonstrate that Hayward intentionally took his own life by swallowing morphine. The appellee insists that the same degree of certainty which the law would require if Hayward were on trial for murder, is required in this case as to the cause of the death, before the theory of appellant can be received as true. Whether this be the correct rule for the trial of a civil cause, we will not decide, but, in our discussion of the evidence, we will assume that to authorize a reversal of the judgment rendered for appellee, the minor facts must themselves be established beyond a reasonable doubt; that they must be consistent with each other, as well as with the main fact, and must be inconsistent with any other reasonable hypothesis than the theory of appellant.

What are the material facts in evidence? Richard Hayward was insured in the Mutual Life Insurance Company of New York for $10,000; at the time of his death he was about fifty years of age, and had a wife and several children; was for many years a prosperous business man, and during that period acquired considerable property, but some five or six years previous to his death, he met with financial reverses which reduced him to insolvency; he took out his policy in the summer of 1890, and between that time and the day of his death, which occurred on the 16th of December, 1891, we find him borrowing money from a friend to meet the payment of the premium on his policy, and returning the loan by borrowing from a brother in another State; in November, 1891, he was employed by the Curtis Manufacturing Company of the city of St. Louis, Mo., a corporation engaged in the business of selling machinery, as its traveling representative in the states of Arkansas and Texas, at a salary of $1800 per annum, payable monthly, with his traveling expenses paid by his employer; and, in accordance with instructions received from the secretary of that company, he went from his home in Houston, Texas, to the city of St. Louis, reaching the latter city between the 20th and 24th of November, 1891, and took lodgings in the Hotel Moser; from the time of his arrival in St. Louis till the afternoon of the 14th of December, he was daily in the store of his employer, and

engaged each day from early in the morning until late in the afternoon in inspecting the goods of the company, and otherwise informing himself as to the duties incident to his employment, and was cheerful and hopeful of success in the business in which he was in a few days to embark; he made a most favorable impression upon the manager and secretary of the company he was engaged to serve, for industry and intelligence and gentlemanly deportment; the three were much together, they usually lunched at the same hour and at the same table, and neither the manager nor the secretary had ever known Hayward, during their intercourse with him, to take any intoxicating drink save perhaps an occasional glass of beer while lunching. Some who had known him for many years in Texas testified that he occasionally drank intoxicants, but not daily or habitually; two or three of such acquaintances, who testified on the subject, had seen him on different occasions under the influence of liquor. A night porter in the Hotel Moser had seen him as many as three times within the two weeks next preceding his death, at a late hour of the night, when he was greatly intoxicated; on one of these occasions he was incapable of taking care of himself, and the porter had to assist him to his room and undress him, and fearing that his valuables might be stolen, the porter took from his person his watch, stud and purse, and had them placed in the safe of the hotel, and they were on the day following delivered to Hayward by the proprietor of the house. Hayward supposed that these articles had been stolen from him; the witness was satisfied from the breath of Hayward, on this occasion, that he had been drinking alcohol; on the other occasions alluded to, he was unable to say whether Hayward's intoxication was from alcohol or from some drug. One of these intoxications occurred not over three nights before his death. Hayward had never followed the calling of drummer or traveling salesman, but he had been engaged for several years in Texas in the mill business; he was well known to Mr. Stuart, the secretary of the Curtis Manufacturing Company, and he was entirely satisfied of his capacity and fitness for the position of traveling salesman; and his acquaintance with the mill men of Texas was a principal inducement to his employment by the company. After he had failed in business, Hayward had engaged in several enterprises previous to his employment as drummer for the Curtis Manufacturing Company; and in each of these he had failed, and several who had advanced him money had sustained losses through his failures; but none of them seemed to have doubted his honesty or integrity. One of his neighbors, a most intelligent witness, who had known him many years, testified that his countenance was frequently of a sad or melancholy expression; but, according to the testimony of the witnesses, Steadman and Stuart, the manager and secretary of the Curtis Manufacturing Company, who were thrown with Hayward for hours each day from the time of his arrival in the city of St. Louis to the 14th of December, he was very cheerful and pleasant, and spoke with much confidence of his success in selling the machinery of his employers, and seemed anxious to get on the road.

On the afternoon of the 14th of December, it was arranged that the 15th should be occupied by Hayward in visiting other stores in the city for the purpose of posting himself as to the prices of their goods and their methods of doing business; and he would also on the same day make some purchases for his wife and family, which Stuart agreed to pay for, and he would return to the store of the company on the afternoon of the 15th, preparatory to his departure from the city on that or the next day; but he did not return according to agreement to the store, nor did he make the purchases for his family, as was subsequently developed. On the evening of the 15th of December, 1891, the witness Stuart found Hayward in his hotel, sick in bed; he was complaining of headache and fever, which he said was the result of cold; the witness did not regard him as seriously sick; he observed medicine on the table in the room, and Hayward was cheerful and requested Stuart to meet him early next morning at the store of the company, as he wished to leave on that day for Texas. Before Stuart left, which was between 9 and 10 o'clock p. m., he lent to Hayward, at the request of the latter, a small sum of money, a dollar and a few cents, which Hayward said he would need to pay for his breakfast, the Hotel Moser being conducted on the European style, the guests being furnished washing and lodging by the week, and being required to pay cash for each meal. On the morning of the 16th, between seven and eight o'clock, one of the porters in the hotel, while passing Hayward's room, had his attention arrested by labored and hard breathing, accompanied with groans, and upon unlocking the door with his pass key and entering the room, he found Hayward lying upon his bed, in his shirt and drawers and partially covered, in an unconscious condition, and the clerk of the hotel was immediately requested through the speaking tube to send some one to the room, as its inmate was dying. The clerk at once repaired to the room, and, upon seeing the condition of Hayward, called Doctor Irwin, whose residence was next door to the hotel, to him; this physician arrived in a few moments and treated his patient vigorously for morphine poison, applying the usual remedies, and remained with him until his death, which occurred between two and three o'clock p. m. of the same day, all the efforts of the physician being unavailing to arouse his patient for a moment even to consciousness. This physician was the coronor of the city, and he testified before the inquest held upon the body of the deceased by his deputy, that the cause of death was poison from morphine; and such was the verdict of the inquest. There was a small empty bottle on the table in the room, without a label, and there was also a bottle labeled quinine, and a third bottle of about the measure of half a pint, in which there was a small quantity of alcohol, and one witness testified to seeing on the table several small papers resembling such as are used by physicians and druggists for enfolding powders; but the contents of these papers were gone, and what the contents were was not disclosed by the papers, and upon the table upon which were lying several letter heads of the Curtis Manufacturing Company

was an open note addressed to Stuart in these words:  "Telegraph Sam Allen, Houston, Texas.  I have ceased to be a man.  I have broken a sworn vow," and signed "Richard Hayward."  This note was not pro-duced upon trial; it was delivered by the proprietor of the hotel to a policeman with the effects of deceased, in obedience to an ordinance of the city, and by him taken to the central police station, and while in custody of the officer in charge of that station, it was read, copied and published by a reporter of one of the city papers;  the note was read also by several others before it was taken from the hotel, and all who read it agreed as to its contents, but the porter who first entered the room; he adds to what we have given as the contents of the note the words:  "I have ceased to live."  All of the effects of the deceased which the wit-ness Stuart knew were in his possession after his arrival in the city were found in the room and taken possession of by the proprietor of the hotel, except a gold ring set with a colored stone;  this ring was miss-ing and has never been found, though sought for.  About the same amount of money lent the deceased by Stuart the night previous was in his possession at the time of his death.

Upon the trial of the cause before the jury, besides the testimony of Doctor Irvine, of St. Louis, there was the expert testimony of several physicians of Houston, some of whom, if not all of them, are eminent in their profession; and the consensus of their opinion was, that it is often difficult to distinguish morphine poisoning from apoplexy: and that, without an autopsy, it was impossible to say with absolute cer-tainty of what the deceased died.  One of the Houston physicians, who was the family physician of deceased, and who several months previous to his death, had treated Mr. Hayward when seriously threatened with apoplexy, was of the opinion that Hayward died of that disease; on the other hand, several of these physicians testified that had they been called to his care and treated the patient for seven or eight hours and remained with him until his death, as Doctor Irwin had done, they would have been able to determine with reasonable certainty the cause of his death.  From this testimony our conclusion is, that the de-ceased came to his death from morphine poisoning; such conclusion, it seems to us, is supported by a great preponderance of the evidence supplied by the expert witnesses.  It is true that the witnesses tell us it cannot be determined absolutely what caused the death of Hayward, but the law does not require absolute certainty.  Judicial truth does not always coincide with the exact truth; this is unavoidable from the imperfections of the human mind and of human knowledge; and con-sequently, the law requires not mathematical but only moral certainty. But when, in connection with the testimony of the expert witnesses, we consider several other facts established beyond a reasonable doubt by the evidence, the conclusion is irresistible, that the deceased died from morphine administered by himself, with the intention to destroy his life.  If the deceased did not commit suicide, the note testified to by the witnesses, and of the authenticity of which and of its contents,

there can be no reasonable doubt, is meaningless, but if, when he penned that note, his self destruction was resolved upon, the purpose of the note is obvious. This note, as counsel seemingly hold, does not direct Stuart to telegraph Allen that the writer "had broken his sworn vow." What Stuart should telegraph Allen is not stated in the note. When Stuart should receive the note, he would readily understand that the wish of the writer was, that the announcement of his death should be made to his neighbor and friend, Sam Allen. The words: "I have broken a sworn vow"—"I have ceased to be a man," are added as the cause of his desperate resolve. Had the deceased made vows of abstinence from alcoholic drinks to Allen, and were the language of the note ambiguous, it might with some reason be said, as is suggested by counsel for appellee, that the note was but the idle musings of a drunken mind. But the language of the note is not uncertain, nor had the deceased made vows to his friend Allen.

We must, as we have already stated, consider the facts in connection with each other, and, if one of them be inconsistent with the others, the factum probandum cannot be inferred, and the evidence must be rejected. Does the fact that the deceased was on the 14th of December, as he had been on every day previous to that time, while in company with the officers of the Curtis Manufacturing Company, cheerful and hopeful of the future, and anxious to return to his home, and to enter upon his new labors, require us to reject the conclusion as improbable, that after the departure of his friend, Mr. Stuart, on the night of the 15th, the deceased did intentionally take his life? We think not. In resolving this question, we must bear in mind the note to Stuart, and the testimony of the night porter, who, a few nights before, had assisted him to his room and to bed. While engaged in the labors of the day his mind is diverted from its woes, but as night returns and his work in the warehouse ceases, his thoughts revert to the past; and, brooding over his misfortunes, he seeks relief in drink, and when visited on the evening of the 15th by his friend and employer, he had not fully recovered from the debauch of the previous night. When Stuart is gone, and he is again alone, he reflects upon his conduct; the presents for his family have not been purchased, he has not been able to keep his engagements with his employers, he has scarcely gained their confidence ere he had abused it, he realizes, in the language of his note, that "he had broken his sworn vows—he had ceased to be a man," he is overwhelmed with remorse and shame, and disgusted with himself, and he resolves upon self destruction. Despite our sympathy, our minds can discover no other rational hypothesis, consistent with the facts we have related, and which were developed and established beyond a reasonable doubt on the trial, than the theory of appellant; and we are, therefore, of the opinion that the eighth assignment, which is in these words, "The verdict of the jury was wholly unsupported by the evidence, in that defendant established by the manifest weight of

the evidence that Richard Hayward did die by his own act, within two years from the date of the issue of the policy," must be sustained.

We are also of the opinion that the appellant's first assignment of error, which is as follows: "The court erred in permitting to be read to the jury that part of Jas. H. Stedman's deposition which consists of the following interrogatory: 'State whether or not Richard Hayward, the insured, from his conduct and his actions in your presence the last time you saw him conscious, did or said anything indicating an intention or desire on his part to take his own life,' and the following answer: 'There was nothing to indicate that he had the least intention of taking his own life;' because defendant's objections set out in his first bill of exceptions, and further amplified in the third paragraph of its motion for a new trial, were well taken," must be sustained. The testimony objected to was the opinion of the witness. Haynie v. Baylor, 18 Texas, 498. This testimony does not come within any of the exceptions to the rule which excludes the opinion of a witness.

The criticism of the court's charge by appellant is to a large extent just, and that portion of the charge which submits to the jury the issue of accident or mistake in taking morphine, is positive error. There was no evidence before the court authorizing such an issue.

The judgment is reversed and the cause remanded.

WILLIAMS, ASSOCIATE JUSTICE.—I concur in the conclusion reached upon the facts. I do not agree to the proposition that the evidence to establish suicide reaches the degree of intensity required in criminal cases to establish guilt by circumstantial evidence, nor do I hold it essential that it should do so in order to make out the defense. I agree to the disposition made of other points.

*Reversed and remanded.*

Delivered February 13, 1896.

Chief Justice Garrett did not sit in this case, and a former opinion by him in the cause was set aside because of his disqualification.