STATE MUT. LIFE INS. CO. OF ROME, GA., v. LONG et al. (No. 1454.)

(Court of Civil Appeals of Texas. Texarkana. May 6, 1915.)

1. INSURANCE ⊜⇒665—LIFE INSURANCE—SUICIDE—SUFFICIENCY OF EVIDENCE.

In an action on a life insurance policy with a suicide clause, evidence *held* sufficient to show that insured killed himself.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1707–1728; Dec. Dig. ⊜⇒665.]

2. APPEAL AND ERROR ⊜⇒999 — REVIEW—FINDING—TESTIMONY BY DEPOSITION.

Where the testimony of a witness was by deposition, the finding of the jury on the issue, as to which his was the only evidence, was not entitled to the conclusive force it otherwise might have been, since the jury were not in a position to draw inferences as to the witness' credibility from his demeanor.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3912–3921, 3923, 3924; Dec. Dig. ⊜⇒999.]

Error from District Court, Dallas County; Kenneth Foree, Judge.

Action by Virginia F. Long and others against the State Mutual Life Insurance Company of Rome, Ga. Judgment for plaintiffs, and defendant brings error. Reversed, and cause remanded, with a suggestion.

Thompson, Knight, Baker & Harris and Geo. S. Wright, all of Dallas, for plaintiff in error. Capps, Cantey, Hanger & Short, of Ft. Worth, for defendants in error.

WILLSON, C. J. Virginia F. Long, one of the defendants in error, wife of George Long, the other defendant in error, and mother of H. L. Long, deceased, was the beneficiary named in a policy, dated September 9, 1908, for $3,000, issued by plaintiff in error on the life of said H. L. Long. Forming a part of the policy was said H. L. Long's application therefor, containing a stipulation as follows:

"I agree on behalf of myself and of any person who shall have or claim any interest in any policy issued on this application as follows: That in case the insured commits suicide, while sane or insane, within one year from the date of the policy, the limit of the recovery thereunder shall be the amount of the premium paid."

Said H. L. Long died within one year from the date of the policy, to wit, on January 17, 1909. Plaintiff in error claimed that he committed suicide, and therefore that it was liable only for the amount of premium paid on the policy, to wit, the sum of $94.68. The suit was by Mrs. Long, joined by her husband, to recover of plaintiff in error said sum of $3,000, interest thereon, and damages and attorney's fees provided for in article 4746, Vernon's Statutes. The only question propounded to the jury was one as follows: "Did Henry L. Long commit suicide?" The

answer being in the negative, the court, on motion of defendants in error, rendered judgment in Mrs. Long's favor for $4,527.60, being the aggregate of the sum mentioned in the policy and of sums representing interest thereon and statutory damages and attorney's fees.

[1] Careful consideration of the testimony in the record has convinced us that the contention made that the judgment is wrong, because "the undisputed evidence showed that H. L. Long committed suicide," should be sustained.

At the date of his death said H. L. Long was about 24 years of age. Between 8 and 9 o'clock of the evening of Sunday, January 17, 1909, the witnesses Fullingham and Woodey, then in the latter's office in the town of Emma, heard the report of several pistol shots fired in W. F. Montgomery's store, situated 75 feet west of said office. Said Fullingham and Woodey at once went to the porch of the office, and within three or four minutes after they heard the shots heard a sound as of glass breaking, and Woodey saw the witness Marvin C. Walls, a boy then about 19 years of age, come out of the Montgomery store through a window from which he had broken the glass. Walls ran to where Fullingham and Woodey were and told them "that Long had shot Montgomery and then shot himself." Fullingham and Woodey, Ray, the sheriff, who also heard the shots, and others who joined them, at once went into the Montgomery store through the broken window, where they found Brub Montgomery dead from the effect of a gunshot wound in his head, and H. L. Long unconscious and dying from a gunshot wound in his forehead. Said H. L. Long died within 30 or 40 minutes after the parties mentioned found him wounded as stated. Marvin C. Walls and H. L. Long and Brub Montgomery were the only persons in the store at the time the shooting occurred. Walls' account of the shooting and incidents accompanying and preceding same, testifying by deposition, was as follows:

"The facts surrounding the death of H. L. Long are as follows: About 15 minutes before the shooting which caused the death of Long, I was looking for Lewis Chance, and had occasion to pass Montgomery's store where the shooting took place, and I was— as I was passing Montgomery's store I heard Mr. Long talking to some one over the telephone. I recognized Mr. Long's voice, and requested him to open the door, which he did. When I went into the store I found H. L. Long and Mr. Brub Montgomery inside. As soon as I went in Mr. Long locked the door. Brub Montgomery was lying down on one of the counters near the door, about 15 or 18 feet from the front door. Mr. Long and I walked back to where Mr. Montgomery was lying on the counter. Mr. Long and I remained standing near the counter. We had been in the store then something about 10 minutes, when Mr. Long said to Mr. Montgomery, 'Brub, ain't you tired of living?' and Mr. Montgomery replied that he was tired of living and to blow his lights out. Long then moved his revolver out of his pocket and asked me if I was tired of living, and pointed the revolver right into my face. When he did this, I took hold of the revolver with my left hand and his arm with my right hand and held them. I asked Long to let down the hammer of his gun and put it up, and he laughed some and put down the hammer and put the revolver back in his pocket. There was some further conversation, but I do not remember just what was said, for about five minutes, when Long again asked Montgomery if he was tired of living, and Montgomery said, 'Yes, blow my lights out.' Long said, 'Out they go,' and suddenly pulled his revolver out of his pocket and cocked it. I jumped and grabbed at the revolver, which was pointed directly at Montgomery. As I grabbed at the revolver, Long suddenly jerked it aside, and I missed it. Before I could get hold of it he threw the revolver across my arm, or right over my arm, and fired at Montgomery. Montgomery was lying on his back on the counter, and there was a light burning near his head. When the revolver was discharged at Montgomery, the light went out. After Long fired the shot at Montgomery, I heard him take a step or two forward and then a step or two backwards. I was close to him and to his body. He then fired another shot. Within a second or two he fired another shot, and immediately fell to the floor. He was standing in the store near the counter where Montgomery was lying, when I last saw him alive. There was no one present at the time Mr. Long shot himself and Mr. Montgomery, except Mr. Long, Mr. Montgomery, and I. Mr. Long fired the shot that killed him, and killed himself. * * * While I was waiting for Mr. Long to open the door before I went into the store, I heard him talking with some one over the phone. Mr. Long said: 'You can have all I own, every damn thing I have got.' I have since heard that he was talking to Lewis Chance, but I do not know that of my own knowledge. * * * I did not see them drink any liquor while I was in the store, but Mr. Long remarked to me a short time after I went into the store that he had been drunk all evening. * * * Neither of them had been drinking any liquor or whisky while I was in the store. Neither one acted like he was drunk. Long did not stagger. * * * I do not remember just what was said while we were in the store, except what I have heretofore stated. We were talking and joking some, just like men will. * * * On the evening of the killing, Long seemed more excited because he feared the officers were going to arrest him. He said everybody in town could not take him alive. * * * I remember two or three weeks before he (Long) killed himself, one night, when Mr. Montgomery and I were in Chance's barber shop. Mr. Montgomery was seated in a barber chair in the barber shop. Mr. Long pulled his revolver out of his pocket, and said, 'Let's kill that fellow.' I, of course, caught hold of Long and persuaded him not to shoot."

Unless the jury had a right to ignore the testimony of Walls set out above, their finding that H. L. Long did not commit suicide is, of course manifestly wrong. The contention of defendants in error is that the jury had that right, and, as supporting their contention, they insist:

(1) That there was testimony showing said H. L. Long to have been of a cheerful disposition. Whatever probative force the testimony referred to ordinarily would be entitled to we think was destroyed by other testimony showing that, at the time the shooting occurred, said H. L. Long was under the influence of liquor, and testimony showing that, when in that condition, "he was," as the wit-

ness Woodey said, "a different person," and "did unreasonable things."

(2) That there was no testimony showing a reason why said H. L. Long should commit suicide. Certainly there was no testimony showing a valid reason for the act. But if he "did unreasonable things while drinking," as the witness Woodey said he did, and as many men do when in a like condition, the absence of a reason of any kind for the act, we think, would not tend to discredit the witness Walls. However, a reason which may have then appeared to the unfortunate young man to be sufficient, is disclosed by the testimony of the witness Fullingham, as follows:

"I was in the store of W. F. Montgomery, where E. J. (Brub) Montgomery worked about one hour prior to the time I heard the gunshots and found the dead body of E. J. Montgomery and H. L. Long dying. * * * Saw Long and Montgomery take a drink. * * * I entered the store at the * * * at the extreme back door of the building, which is the door of an addition to the main store building, and just as H. L. Long opened the door, or at practically the same time, I heard a pistol shot up toward the front of the store, and Long and I went into the main store building. E. J. Montgomery was standing at a side door with a pistol in his hand and he stated that he had accidentally discharged the pistol. I took the pistol and laid it on a dry goods shelf near the side door. * * * Montgomery explained to us that he discharged the pistol accidentally, and I told him that he should be more careful; that people were going to church and some one might be hurt. * * * Montgomery did not want to give me the pistol at first, and I argued and joked with him, and finally wrenched the pistol out of his hand and put it up. * * * After the shot, and while I was still in the store, C. E. Ray, sheriff of Crosby county, knocked on the door, advising who it was, and all parties in the store remained quiet until after he departed."

The testimony of the witness Ray, then sheriff, as follows:

"On the night of the death of H. L. Long, A. D. Meyer, the hotel man in Emma, phoned me to come up to his hotel. I went, and he told that he had seen a jug of whisky unloaded at the rear of Montgomery's store, and that he thought he would put me on to it. * * * About one hour prior to the time I first saw him (H. L. Long) after he was shot, I was at the rear of Montgomery's store and looking through a window I saw E. J. (Brub) Montgomery holding a lamp in his hands and H. L. Long had a jug up to his mouth."

And the testimony of the witness Chance as follows:

"I was in the phone office in the Meyer Hotel. I had a conversation with H. L. Long over the telephone a short time before he met his death on January 17, 1909. I called H. L. Long to the telephone and told him that a carriage was waiting on the outside to arrest him and Brub Montgomery, and when they came outside they had better leave their pistols in the store, if they had any, and they would not have to pay fines for carrying pistols. About 10 minutes after that H. L. Long called me up over the telephone and asked me to come down and knock on the door three times when the sheriff left; that he wanted to go home; and he would know by the knocks on the door that the sheriff had gone. I told him I would be down in about 15 minutes. I had a talk with H. L. Long over the telephone about 10 min-

utes before he killed himself. He did not say anything about taking his life."

(3) That there was testimony showing there were no powder burns on the face of the deceased (Long), and testimony of experts showing that it would not have been possible for him to have shot himself, as Walls said he did, without being burned by powder. The testimony referred to, considered alone, was entitled to little, if any, weight as discrediting Walls, and particularly so in view of the testimony of Dr. Crow, which accords with common knowledge, that:

"There are unusual things that happen in gunshot wounds. If the pistol was pressed close to the body at the forehead, the powder marks would probably follow through the hole the bullet made."

(4) There was testimony showing that said H. L. Long had a bruise about two inches long and a half inch wide on the back of his head, about two inches above and back of his right ear. After the shooting Long was found lying on his back on the floor of the store. That the bruise referred to was due to anything else than his fall to the floor was not even remotely suggested by any of the testimony heard.

(5) That in his testimony Walls made contradictory statements, and was shown to have made statements to the witness Campbell inconsistent with statements he made as a witness. Fairly construed, it is doubtful, we think, if any of the statements made by Walls as a witness, or to Campbell when not a witness, contradicted each other, but, if they did, they were about immaterial matters and fell short of discrediting him.

As we view it, the testimony of Walls was not only not impeached by any other testimony, but, on the contrary, it was consistent with and corroborated by practically all the other testimony given at the trial. Shortly after the killing, Walls secured a horse and went after the justice of the peace and acting county attorney, who at once, it seems, when they arrived at the scene of the killing, held an inquest to determine the cause of the death of the two men. Walls was one of a number of witnesses who testified at the inquest. The finding was that H. L. Long "came to his death by a gunshot wound which was self-inflicted while he was temporarily insane." Walls continued to reside in the town of Emma, where Long and Montgomery died, until October, 1909. So far as the record shows to the contrary, he was never either suspected or in any way accused of having himself killed Long and Montgomery. The witness Bonine testified as follows:

"Within three months prior to the time of his death, I had a conversation with H. L. Long in which he made a statement with reference to the taking of his own life. I thought he was joking, as he was laughing at the time that he said it. I was sitting at the desk working on the books, when H. L. Long said to me, 'Kid are you about ready to pass in your checks?' And I said to him: 'No, let's wait a while.' At the time H. L. Long had a pistol and was

whirling it on his finger. When I told him to wait a while, H. L. Long put his pistol on the desk, and I picked the pistol up and put it in my pocket. I think H. L. Long was under the influence of liquor at that time. H. L. Long asked me if I was ready to pass in my checks, and said, 'I am if you are.' He had a pistol. I think it was a 38 caliber on a 45 frame. I think he had borrowed the pistol from Brub Montgomery. H. L. Long whirled the pistol on his finger. We were laughing and talking, and I do not remember all that we said. This conversation occurred in the First National Bank at Emma, Tex., about 8 or 10 days before he killed himself, about 12 o'clock at night. The statement I have testified about was made at the time in a jocular manner. H. L. Long and myself worked together in the bank. H. L. Long only drank once in a while, and I do not suppose that any one knew he drank. I could hardly tell it on him myself, and I was with him constantly. With regard to the occurrence in the bank, I do not know of any pistol behind the grate. In fact, there was no grate in the bank, H. L. Long was whirling a pistol on his finger. He got the pistol out of a drawer in the desk. And, when he asked me if I was ready to pass in my checks, he said it in a joking way, and I didn't want him to think that he meant it. I told him not to shoot up the bank and to be careful with that pistol. He said, 'All right;' and also said that I could have it. At the same time threw the pistol at me on the desk."

[2] The testimony of the witness Walls having been given by deposition, the jury were not in a position to draw inferences as to his credibility from his demeanor as a witness, and their finding, therefore, is not entitled to the conclusive force it otherwise might be. Thorn's Heirs v. Frazer's Heirs, 60 Tex. 263; King v. Worthem (Civ. App.) 37 S. W. 1133.

The judgment will be reversed, and the cause will be remanded for a new trial, with the suggestion to the court below that, if the testimony on another trial is the same as it was on the last, the jury should be instructed to find in favor of plaintiff in error.