## HOME BENEFIT ASS'N v. BURO.
### (No. 689.)

Court of Civil Appeals of Texas. Waco.
Oct. 4, 1928.

Rehearing Denied Nov. 8, 1928.

Wm. C. Morrow, of Hillsboro, for appellant.

Will M. Martin, of Hillsboro, for appellee.

BARCUS, J. Mrs. Buro, the wife of appellee, had a life insurance policy with appellant for $1,000. The policy was issued on October 12th, when Mrs. Buro gave a check for $5 for the initial fee. The check was turned down by the bank for insufficient funds, and on October 19th she paid $5 in cash with which to take up the unpaid check. On October 20th she shot herself, and died from the pistol wound on October 21st. The policy was payable to appellee, and he instituted this suit to recover thereon. The sole defense of appellant is based upon the proposition that the company is not liable under the terms of the policy if the assured commits suicide within one year after the issuance of the policy. The cause was tried to a jury and submitted on the one issue, and the jury found that she did not commit suicide.

Appellant's sole contention in this court is that the evidence is not sufficient to support the finding of the jury. We sustain this contention. Mr. and Mrs. Buro lived in the country, being tenant farmers in Bosque county. Mrs. Buro was a very large woman, weighing about 275 to 300 pounds, and in apparently good health. Complaints had been filed against her in Hill county, charging her with forging her landlord's name to checks and charging her with having passed forged instruments. Two officers of Hill county, together with two officers of Bosque county, went to her home in Bosque county to arrest her on these complaints. They found her in the yard of her home and told her they had come to arrest her and take her to Hill county to answer said charges. She asked for and was given permission to go in the house to change her clothing. The four officers who were there waited outside the house, sitting on the running boards of their automobiles. In about 10 minutes she opened the door and told them it would be some 20 minutes longer before she was ready to go. They heard her moving about in the house, but finally everything became quiet, and the officers started toward the house and heard a pistol shot. They rushed to the door and found same locked; they broke it open and found Mrs. Buro lying across the bed with a pistol wound through her body. The bullet entered her body in front almost over the heart and went straight through the body. In order for the bullet to have gone in the direction it did, under the testimony, it was necessary for the pistol to have been held at right angles to the body. Mrs. Buro's clothing was powder burned, and the wound was also powder burned, showing that the pistol was very near the body at the time it was fired. Mrs. Buro's body was lying diagonally across the bed. She was completely dressed, except she did not have on her shoes. Her right hand was hanging off the bed, and the pistol lying on the floor some 18 inches from her hand. One of the officers immediately went for some of the neighbors, and two or three women came in, and in about an hour the doctor arrived. The shooting occurred about 1:30 in the afternoon, and about 6 o'clock Mrs. Buro was taken in an ambulance to the sanitarium at Hillsboro, where she lingered until the next afternoon, when she died. The doctor who attended her in Bosque county did not testify. The record shows that when the doctor came Mrs. Buro sat up on the bed, wheth-

er voluntarily or involuntarily not being shown. The doctor examined the wound where the bullet entered and where it came out and administered to her. Mr. Buro came about one hour later, and he testified his wife seemed to be suffering intensely and was screaming. Mrs. Conrad, a sister of Mrs. Buro, testified that she reached the home about an hour after Mrs. Buro shot herself; that she tried to talk to Mrs. Buro in German and asked her if it hurt her to talk, "and she shook her head that way" (indicating); that she asked her if she shot herself purposely, and she "shook her head" (indicating). The officers and the other women, who were present until they carried Mrs. Buro to the sanitarium in Hillsboro about 6:30, testified that they were there in the room or on the gallery just outside the door, and that none of them heard Mrs. Buro say anything, and none of them heard the questions asked by Mrs Conrad. None of the witnesses attempted to testify that Mrs. Buro was able to talk or able to understand, or whether she was paralyzed, or whether she was in a condition to understand anything. The record is completely silent as to whether Mrs. Buro was conscious or unconscious from the time she was shot until the time she died some 28 hours later, except the statement of Mr. Buro, above quoted, that when he came in she was suffering and screaming, and the shaking of the head as testified to by Mrs. Conrad in reply to the questions she asked. Mrs. Conrad testified that her questions were asked about an hour after Mrs. Buro shot herself.

The record shows without controversy that the policy of insurance had been paid for the day before the shooting, and that Mrs. Buro was charged by complaint with having committed two or more felonies, and that the officers were there to arrest her for said offenses. There was no question but that she shot herself, the only question being as to whether is was intentional or accidental. While we recognize the rule of law to be that it is presumed, when a person shoots himself, it is an accident, and that it devolves upon the party contesting same to show that the shooting was done with suicidal intent, we think the evidence in this case so strongly indicates that Mrs. Buro deliberately committed suicide that the verdict should not be permitted to stand. The record is in such an unsatisfactory state that it at least can perhaps be more fully developed on another trial. As herein stated, the doctor who first examined Mrs. Buro did not testify, and there is not any testimony from any of the witnesses that in any way tends to show or indicate whether Mrs. Buro was conscious or unconscious, or whether she was able to understand what was said or done, or what her physical or mental condition was from the time she shot herself until the time of her death. Grand

Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788; State Mutual Life Ins. Co. v. Long (Tex. Civ. App.) 178 S. W. 778; Mutual Life Ins. Co. v. Hayward, 88 Tex. 315, 30 S. W. 1049, 31 S. W. 507; Id., 12 Tex. Civ. App. 392, 34 S. W. 801; Knights of Maccabees v. Hair (Tex. Civ. App.) 192 S. W. 801; Woodmen of the World v. Alexander (Tex. Civ. App.) 239 S. W. 343.

The judgment of the trial court is reversed, and the cause remanded.