## UNITED FIDELITY LIFE INS. CO. v. ADAIR.

### No. 1325—5430.

Commission of Appeals of Texas, Section A.

June 25, 1930.

Thompson, Knight, Baker & Harris, of Dallas, and Bledsoe, Crenshaw & Dupree, of Lubbock, for plaintiff in error.

Bean & Klett, of Lubbock, for defendant in error.

CRITZ, J.

This suit was brought in the district court of Lubbock county, Tex., by Mrs. Cassie Adair, surviving wife of Eugene T. Adair, to recover $4,500 with interest, and the statutory penalty and $1,500 alleged to be a reasonable attorney's fee. The policy was issued November 20, 1925, and the insured died March 7, 1926. The insurance company filed its amended answer contesting the same on the ground of self-destruction or suicide on November 1, 1926.

The policy contained the following provision:

"If the insured whether sane or insane, shall die of self-destruction within one year from the date hereof or before the second annual premium becomes due the amount payable hereunder shall be the amount of premiums actually paid under this policy."

Trial was had in the district court before a jury, and at the close of the testimony the in-

surance company presented a motion for peremptory instruction in its favor on the ground that the evidence showed, as a matter of law, that the insured intentionally killed himself within less than one year from the issuance of the policy. This motion was overruled by the court. The insurance company also requested two special charges which in effect amounted to peremptory instructions, both of which were refused and exceptions duly reserved.

The trial court then submitted the case to the jury on special issues, and in response to these issues the jury found:

That the insured did not intentionally kill himself, and that $1,000 was a reasonable attorney's fee.

On the above verdict the trial court entered judgment for Mrs. Adair for the face of the policy, plus 12 per cent. penalty, and $1,000 attorney's fees and interest, aggregating $6,880. This judgment was affirmed by the Court of Civil Appeals for the Seventh District at Amarillo. The case is now before the Supreme Court on writ of error granted on application of the insurance company.

The case is presented in the Supreme Court under several assignments of error, but they all amount to one contention, which is that the undisputed evidence in the trial court establishes, as a matter of law, the fact that the insured committed suicide at such a time as to limit the right of recovery to the amount of premiums actually paid. In order to pass on this contention, we must of necessity make a very extended statement of the facts and circumstances leading up to and surrounding the death of the insured.

Insured had for several years been engaged as an automobile dealer at Lubbock, Tex. In the operation of his business he sold automobiles and frequently took notes as part consideration secured by mortgages against such automobiles. These notes and mortgages were disposed of to different parties, principally to finance companies engaged in the business of buying such paper. For some time prior to his death the insured had engaged in the practice of taking duplicate and sometimes triplicate mortgages on automobiles which he had for sale. He would sell these different mortgages on the same car to different parties and finance companies. In this connection he would usually sell a car to one of his employees, who would execute notes and a mortgage on the car, and said notes and mortgage be disposed of to some finance company; and when a bona fide purchaser was found for the same car the notes and mortgage of this bona fide purchaser would be taken and these notes also negotiated, usually to some finance company. These duplications and fraudulent transactions had been discovered shortly prior to the death of the insured, and representatives of the holders of these fraudulent

notes had interviewed the deceased and threatened him with criminal prosecutions. Insured had admitted to the representative of one of the finance corporations holding some thirteen or fourteen thousand dollars of these fraudulent papers that he had been doing wrong and asked that he be indulged a reasonable time to straighten up the matters. At this time several of the insured's creditors were pressing him for their money.

On Wednesday preceding his death insured, in company with his business partner, made a trip of several hundred miles by automobile from Lubbock, Tex., to El Paso, Tex., in an effort to secure money to discharge these pressing obligations. It seems that this trip was futile. Before leaving for the trip to El Paso, insured borrowed from a city policeman a 45 Smith & Wesson double-action Army model six-shooter, or pistol, which he took with him on his trip, advising the officer that he would be driving strange roads at night and wanted a pistol for that reason. Insured returned from El Paso to Lubbock about 4 o'clock on the following Sunday morning. While he was on this trip, one of his creditors made a complaint against him, charging the offense of felony swindling based on one of the fraudulent mortgages above mentioned. When insured reached home he was tired from an all-night drive, and his wife asked him if he wanted to take a bath. He said he would and took his suitcase, which he had carried on the trip to El Paso, into the bathroom, set it down, and then decided that he was too tired to bathe and went to bed and to sleep. About an hour later a deputy sheriff of Lubbock county, Vernice Ford, in company with a Mr. Settle, went to the insured's home with a warrant for his arrest on the complaint filed. When the officer and Mr. Settle arrived at the insured's home, Mr. Settle went to the back door, and the deputy knocked at the front door, and when Mrs. Adair came in response to the knock the deputy asked to see her husband. Mrs. Adair asked him to wait until morning, which the deputy declined to do. The officer was then admitted by Mrs. Adair and invited and accompanied to the room where insured was in bed. The insured was then informed that the officer had a warrant for his arrest. He immediately got up, went to the front room, read the warrant, and began dressing and talking to the officer. He completed dressing in the living room, including his hat and overcoat, and then asked permission to kiss his wife and children good-bye, which was allowed. After Adair had kissed the children and told them to be good, the officer heard a sound in the neighborhood of the bathroom as though a glass was taken off a shelf, and the water turned on a little; the officer then heard a click like a glass was set down, and in a second he heard the report of a pistol coming from that part of the house. The officer went immediately to the

bathroom door, which was almost closed, and on pushing it back saw the insured lying on the floor of the bathroom resting on his right arm and elbow. The 45 six-shooter, the barrel of which was still warm and smoking, was lying close to insured's right hand. The insured made no answer when accosted by the officer. The odor of gunpowder could be detected in the room at that time. The pistol had one chamber discharged and the other five loaded. A doctor was called, and the sheriff and undertaker also came in a few minutes. The bathroom was approximately 6½ feet by 7 feet, the lavatory on the north, the bathtub on the east, the commode on the south, and the door to the north of the center of the west side of the room, with the shutter hinged on the north. There were two windows in the bathroom, one on the east side and one on the south. An examination made a few minutes after the discovery of the insured's body showed that the window shade was down. There was a bullet hole through the window shade. An examination of the bullet hole, in an effort to determine the range of the bullet, showed that the bullet went through the window and shade practically on the level. There was also a hole through the window screen of the window also. The shattered glass was located between the window pane and the screen on the outside of the window. The fabric of the curtain extended towards the outside. The wires in the screen were bent outward. There were little blood stains on the inside of the window curtain, near the bullet hole.

It was also shown by the officer that he was familiar with the use of guns and pistols, and that a pistol could be accidentally discharged while loading it or dropping it on some object or striking the hammer against some object or by pulling the trigger. It was also shown by this officer that all manner of accidents happen with firearms; that men kill themselves accidentally with firearms; that men sometimes carry guns with the hammer on the shell; that a man standing up and examining a gun could accidentally drop it, grab for it, and the gun hit some object and be discharged, and in that way shoot himself in the body. It was also shown by this officer that Adair did not resist arrest in any way and did not refuse to go with the officer.

Mr. Settle, who stood just outside the window of the bathroom, testified among other things that he saw Adair enter the bathroom, turn north to get a drink of water, heard the water running in the lavatory, saw Adair push the bathroom door partly closed to get to the water. After he heard the water running, insured turned around and pulled down the window shade on the south side of the bathroom, and in a few seconds thereafter the witness heard the report of a pistol, and the noise of the glass shattered by the shot, and as quickly as he could went to the front door, and on into the bathroom. This witness said that he saw no one outside the building, and he himself was unarmed.

The physician testified in substance that when he arrived shortly after the transaction insured's body was warm, and that an examination showed that the bullet entered the front, passed through the overcoat, dress coat, and the body of insured, and went out to the left of the spinal column with the point of exit possibly a little lower than the point of entrance, but practically on the level. That there was an ashy deposit on the coat around the bullet hole that you got with white powder; that there were blood specks on the inside of the window shade; that the hole in the window shade, the glass, and the screen showed the bullet to have gone practically on the level; and that the bullet pierced the body and the heart between the base and the apex.

Mrs. Adair, the defendant in error, testified that insured had told her before the day he died that his business was getting in bad shape on account of so many cars being returned; that the people could not make the payments; that he had to take it up with the finance people for a certain length of time; and that many people had bought cars on credit that had to be taken back.

Mrs. Adair then further testified that when Mr. Adair got back to Lubbock from El Paso he did not come directly home, but went to the business and called her from there (we presume over the telephone), telling her he would be out in a little while, and in a little while he came home. Mrs. Adair then testified to the happenings in regard to the arrival of her husband at home; his declining to bathe; going to bed; the coming of the officer; and other matters substantially as above related. She then testified, in substance, that she was in the living room when Mr. Adair got through dressing; that she went back to the back bed room; that Mr. Adair stated he wanted to speak to her and they both went back; that Mr. Adair told the officer that he wanted to speak to his wife just a minute and would be back in just a minute; that she and her husband went back to the sleeping porch; that her husband told her not to worry; "that he was going down town with Mr. Ford and that as soon as the Western Union was open that he would wire his brother in South Carolina; that he would be all right and would be home in a few minutes. He was going to wire his brother in South Carolina for financial assistance in order to straighten out matters, and take care of the business that were pressing. His brother in South Carolina was well fixed. He was able to help him financially. He just insisted that I not worry, that he would be back in a short while after the Western Union opened. He then told me 'Good-bye.' He always did that when he left the house anytime a day."

Mrs. Adair further testified that her husband had taken a suitcase with him on the trip to El Paso; that he took the suitcase and started to the bathroom with it when he started to take a bath and set it down on the inside of the bathroom by the door; that it was a large hand bag; that Mr. Adair put on his overcoat and hat before he left the living room; that when he told her good-bye he had on his hat. Mrs. Adair further testified: "I knew his plan and knew definitely what his intentions were and they did not include anything like that. I did not see any gun at all. A great deal of the time we had a pistol in our home. He was very careful with the gun. He never let it lay around where the children could get it. I don't know whether he had the gun in his overcoat pocket or in the handbag; I don't know anything about it. I didn't see anything about his overcoat when he had it on that would indicate that he had a gun in his coat or any of his pockets. He didn't tell me anything about going into the bath room to put the gun away or anything of that kind. I don't know whether he put the gun up when he came in or not; I didn't see the gun."

It was also shown that Mr. and Mrs. Adair had two children, one a boy about 15 years of age, and the other a girl about 10 years of age. From the testimony it is seen that Mr. Adair must have been fully dressed, including his overcoat and hat, at the time of his death.

We here refer to the opinion of the Court of Civil Appeals for further statement of the facts of this case, though we have attempted to make a full statement, and in the making of our statement we have depended largely on the statement of the Court of Civil Appeals, which we find correct in every detail.

As already shown, the only question before the Supreme Court in the instant case is whether the above-recited facts establish the defense of voluntary self-destruction or suicide, as a matter of law.

In passing on this question we have examined the many adjudicated cases on the question cited by both parties to this appeal in their very elaborate and able briefs and written arguments; but we find that it is practically impossible to locate any adjudicated case which can be absolutely applied to any other case. In cases of this character the facts are as different and varied as the cases themselves. It must therefore be readily seen that a court in passing on this issue can only take the facts of each case, and view them as a whole, and from such facts as a whole determine the question in the light of certain well-established rules of law, which rules are:

■ (a) Where death results from violent and external means and not from disease, the presumption is in favor of the theory of accident, and against the theory of suicide. Mutual Life Insurance Co. v. Ford, 61 Tex.

Civ. App. 412, 130 S. W. 769, 777 (Writ of error ref.); Preferred Accident Insurance Co. v. Fielding, 35 Colo. 19, 83 P. 1013, 9 Ann. Cas. 916; Standard Life & Accident Insurance Co. v. Thornton (C. C. A.) 100 F. 582, 49 L. R. A. 116; Bankers' Health & Accident Ass'n v. Wilkes (Tex. Civ. App.) 209 S. W. 230 (Writ of error ref.).

■ (b) Where the trial jury has found that death did not result from suicide and the Court of Civil Appeals has refused to disturb such verdict, the verdict and judgment must stand, unless the evidence establishes intentional self-destruction, or suicide to that degree of conclusiveness which precludes a reasonable doubt to the contrary, and there must be no room for fair and reasonable minds to reach different conclusions from the same evidence. Grand Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788.

■ (c) Where a jury passes on a question, they are the judges of the facts proved, and the weight to be given to the evidence, but they cannot lawfully deny proper weight to undisputed facts with no suspicion cast upon them. Grand Fraternity v. Melton, supra.

■ When we apply the evidence in this case to the foregoing rules, we are unable to say as a matter of law that Adair committed suicide. In other words, we are unable to say that the presumption in favor of the theory of accident, and against the theory of voluntary self-destruction, or suicide, has been rebutted to that degree of conclusiveness which precludes a reasonable doubt to the contrary, and that there is no room for fair and reasonable minds to reach different conclusions from all the testimony in the instant case. The evidence shows that Adair was in serious trouble and knew that his swindling transactions had been discovered when he took the trip to El Paso. He knew that he would, in all probability, be subjected to criminal prosecutions in the event he failed to get money to relieve his financial distress, yet he carried the pistol from Lubbock to El Paso and back, including his visit to his business, on the fatal night without taking his own life, though he had failed to get relief at El Paso. We therefore must conclude in favor of the verdict that the jury found that he borrowed the pistol for the purpose stated by him, and that he had no intention of committing suicide on the trip, and no intention of committing suicide up to the time he arrived at home. When the officer came and arrested him he readily consented to go, and fully dressed himself, including the putting on of his hat and overcoat. It is hardly to be presumed from the evidence that he would put on his hat and overcoat, if at that time he had formed the intent to end his own life in the bathroom a few minutes later. We therefore must conclude in favor of the verdict that the jury found that at the time he dressed himself and donned his hat and overcoat he had then formed no intent

to take his own life. After Mrs. Adair had gone to the back bedroom, insured asked permission to speak to his wife, stating he would be back in just a minute. He got this permission; goes to his wife; he tells her not to worry; that he is going to send a telegram to his brother who is able to help him as soon as the Western Union opens; that everything would be all right and that he would be back in a short time, etc.; and then kisses his wife and children good-bye. He then went into the bathroom, and from the evidence the jury had the right to conclude that he drew a glass of water and drank it. In a few moments thereafter the pistol fired. From these circumstances we conclude in favor of the verdict that the jury found that Adair had no intention of ending his own life when he kissed his wife and children good-bye and told his wife not to worry and about his plans to get help from his brother, etc. It is hardly to be presumed as a matter of law, from the facts of this record, that he would have been so solicitous at this time to comfort his wife, and attempt to relieve her fear and distress, when he had already formed the deadly purpose of sinking his wife and children in the very deepest pit of sorrow and distress by ending his existence with a pistol bullet almost under his wife's eyes, and within a few seconds, or at most a few minutes thereafter. From this we conclude in favor of the verdict, that the jury found that insured had formed no intent to kill himself at the time he told his wife good-bye and informed her of his plans to get relief. When he went into the bathroom, he drew and drank a glass of water; at least, the jury had the right to so conclude from the evidence. A few moments later the pistol fired. It is hardly to be presumed, as a matter of law, that a man who had formed the purpose to then end his earthly existence would stop almost in the very article of death to draw and drink a glass of water. We presume in favor of the verdict that the jury found that he had then formed no intent to kill himself. It therefore follows that the jury must have found from the evidence that up to the time Adair drank the water he had formed no intent to take his own life. If this be true and insured committed suicide, both the intention and the act of suicide were formed and executed in the few seconds which elapsed between the time he put the water glass down, and the time the pistol fired. We also here note that there is no evidence to combat the evidence with reference to deceased having a brother who was able to relieve his financial distress, whom he hoped to get help from. From what we have said it follows that we are not prepared to hold, in the face of the findings of the jury, and of the Court of Civil Appeals, that the evidence in the instant case establishes suicide to that degree of conclusiveness that it is proven as a matter of law.

■ It is true that the facts and circumstances of this record lead us to a very strong belief that Adair committed willful self-destruction, but we cannot render a case on strong belief. The Court of Civil Appeals had the right to pass on the sufficiency of the evidence and to have reversed and remanded for insufficiency thereof, but the Supreme Court has no such jurisdiction or power. It can only pass on questions of law, and unless we can say, as a matter of law, that the evidence conclusively establishes suicide, the judgment must stand. This we are unable to do.

The insurance company cites the following authorities as supporting its contention that the Supreme Court should hold as a matter of law from the circumstances of this case that insured committed suicide: Home Benefit Association v. Buro (Tex. Civ. App.) 10 S. W.(2d) 188; Texas Life Insurance Co. v. Childress (Tex. Civ. App.) 204 S. W. 1035; Mutual Life Insurance Co. v. Hayward, 12 Tex. Civ. App. 392, 34 S. W. 801; Grand Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788. The insurance company also insists that the opinion of the Court of Civil Appeals in the instant case is in conflict with the above-cited cases. We think none of these cases support the contention of the insurance company, or are in conflict with the holding of the court of Civil Appeals in the instant case.

In the Buro Case, supra, the Court of Civil Appeals did not render the case, but reversed and remanded for a new trial. A careful reading of the opinion shows that the court exercised its jurisdiction to pass on the sufficiency of the evidence and did not attempt to render the judgment. Also the opinion shows that the Court of Civil Appeals was of the opinion from the record before it that the case had not been fully developed.

In the Childress Case, supra, the deceased left four letters written on the day of his death and on the preceding day. These letters indicated beyond any reasonable doubt an intention to commit suicide. In one of the letters he gave instructions how he wanted to be buried and named the friends whom he desired to be his pallbearers. He also stated whom he wished to drive the hearse. In the absence of these letters and other statements made by the deceased shortly before his death, there would not have been proof which would have authorized an appellate court to render the judgment.

In the Hayward Case, supra, the deceased left a note, admittedly genuine, which when read in the light of the other circumstances in the case constituted proof of the most convincing character of suicidal intent, and this note when considered in conjunction with the other evidence showed that the deceased intended to commit suicide and was telling them who to notify when they found his body.

The Melton Case, supra, is by the Supreme Court, but in that case the opinion shows declarations of the deceased just before his death

to the effect that he had shot himself; that he shot himself because he was up against it and owed on his home; and that he had asked for the pistol and stated that he wanted it to blow his brains out.

An examination of all of these above-cited cases will show that the Buro Case was not rendered, and in the others the deceased left some letters or made some statement which coupled with the other facts in the case proved suicide beyond any reasonable doubt.

In the case at bar we have no statement, written or spoken, from the deceased which even in the remotest indicates an intention to commit suicide, but on the other hand every statement made by him shows, if it shows anything, an opposite intention.

We recommend that the judgment of the Court of Civil Appeals be in all things affirmed.

CURETON, C. J.

Judgment of the Court of Civil Appeals affirmed.