The PRUDENTIAL INSURANCE COMPA-
NY OF AMERICA, Petitioner,

v.

Frances KRAYER, Respondent.

No. A-9307.

Supreme Court of Texas.

April 3, 1963.

Rehearing Denied May 1, 1963.

Cantey, Hanger, Johnson, Scarborough & Gooch, Fort Worth, Howard Barker and John McBryde, Fort Worth, with above firm, for petitioner.

McEntire & Murad, Fort Worth, for respondent.

HAMILTON, Justice.

This is a suit on a life insurance contract, instituted by the wife of the deceased insured, Kenneth Krayer, against the Prudential Insurance Company of America. The policy insured Kenneth Krayer's life for $5,000 with "double indemnity" if death was caused by accidental bodily injury. The policy further provided that no benefits of any kind would be paid if death was by suicide within two years of the effective date of the policy. Within the two-year period Krayer was found dead in his automobile, shot in the left temple by a .22 caliber bullet.

Mrs. Krayer (respondent) sued both on the basic policy and on the accidental death provision. The insurance company (petitioner) defended on the grounds that Kenneth Krayer had committed suicide and that Krayer had knowingly misrepresented the facts of his medical history with intent to induce the company to issue the policy of insurance. The jury answered all special issues favorably to respondent. The

trial court disregarded the answers to two special issues and entered judgment for petitioner notwithstanding the verdict and ordered that respondent take nothing by her suit. The Court of Civil Appeals reversed and remanded. Tex.Civ.App., 360 S.W.2d 844.

The two special issues inquiring of the manner of Krayer's death, the answers to which the trial court disregarded, are as follows:

"Special Issue No. 1. Do you find from a preponderance of the evidence that Kenneth A. Krayer's death resulted from accidental bodily injury, as the term 'accidental' is defined hereinabove?

"Answer: 'Yes' or 'No.'

"Answer: Yes."

"Special Issue No. 2. Do you find from a preponderance of the evidence that the death of Kenneth A. Krayer resulted from suicide as the term 'suicide' is defined hereinabove?

"Answer: 'Yes' or 'No.'

"Answer: No."

The first special issue is respondent's. She bore the burden of getting a favorable finding on it in order to recover under the double indemnity provision of the contract. The second special issue is petitioner's defensive issue on which it bears the burden of getting a favorable finding.

In sustaining petitioner's motion for judgment notwithstanding the verdict, the trial court found that there was no evidence of accidental death and that the evidence of death by suicide was conclusive. The Court of Civil Appeals agreed with the trial court that there was no evidence of accidental death, but held that the finding against suicide was merely contrary to the weight and preponderance of the evidence, that suicide had not been conclusively established. Mrs. Krayer has no application for writ of error.

The Insurance Company's application for writ of error was granted on a point of error complaining of this holding. The question thus presented is whether the evidence is such that we must say, as a matter of law, that Kenneth Krayer was a suicide. Petitioner has other points of error; among them are points dealing with the defense of Krayer's representations as to his medical history, but in view of our holding on the question of suicide, we do not reach those points. We hold that suicide has been established as a matter of law.

There is a legal presumption against suicide; this has been called a "true presumption" which falls or "disappears" when rebutted; that is to say, this presumption once rebutted does not have weight as evidence. Combined American Insurance Co. v. Blanton, Tex., 353 S.W.2d 847. The question in this case is not whether the presumption has been rebutted, but whether it has been *conclusively* rebutted.

Petitioner has produced circumstantial evidence of suicide which the Court of Civil Appeals characterized as being of "great force". There is no direct evidence of suicide, but the lack of direct evidence does not prevent its being conclusive; an ultimate fact may be conclusively shown by wholly circumstantial evidence. The question is whether reasonable minds might differ as to the inference to be drawn. Cavanaugh v. Davis, 149 Tex. 573, 235 S.W. 2d 972. "When the only reasonable inference which can be drawn from all the evidence is that death was the result of suicide, the presumption against suicide is [conclusively] rebutted." Combined American Insurance Co. v. Blanton, supra. Thus our inquiry is reduced to whether there was some evidence in the record raising an issue either of accidental death or of homicide, the only other possible hypotheses.

It is undisputed that Krayer had been committed to a mental hospital in Buffalo, New York, at the age of fifteen. His illness was diagnosed as schizophrenia, cata-

tonic type. One of the doctors at the Buffalo hospital testified that the nature of this illness is such that one thus afflicted is "unstable and unpredictable". Another testified that such persons "readily and frequently do commit acts of violence either against other people or against themselves." Respondent does not contradict the testimony of these doctors that Krayer was diagnosed as still having this disease when he was finally discharged from the hospital at the age of eighteen. The hospital discharged Krayer at this time because he and his mother left New York and moved to Texas.

While in the hospital Krayer had received some eighteen shock treatments which had caused his condition to improve but did not cure it. Krayer was also diagnosed as having "ideas of reference." This was explained by one of the doctors to mean that one so affected "attached erroneous or pathological significance to ordinary, every-day occurrences. The patient feels that these things refer to him."

When he was twenty Krayer married respondent, who then had a four-year old child born of a former marriage. In 1957, after his marriage to respondent, Krayer became upset by respondent's former husband's failure to make his child support payments. Krayer bought a .22 caliber revolver and left home for a week. He went to Oklahoma and Lake Texhoma. When he returned his mother returned the revolver to the store where he had purchased it. There is disputed testimony tending to show that when Krayer returned he told his wife that he had gone with the intention of killing himself but "did not have the guts to end it all." Krayer's wife and mother deny that he said this.

In April, 1958, Krayer was laid off his job at the Convair plant in Fort Worth. By this time his wife had had one child by him and was expecting another. He took a job selling encyclopoedias, but quit this after two days. Again his wife's former husband got behind on child support payments. The family had $50 in a savings account.

Two days before he disappeared, unknown to his family, Krayer purchased a .22 caliber revolver of the same type he had bought the year before.

The night of his disappearance (April 24, 1958) Krayer stayed up to watch the television while his wife went to bed. Mrs. Krayer awoke about 4:30 a. m. and discovered that he had gone in the car. It is not disputed that Krayer left a note, but the contents of that note are disputed.

Petitioner introduced a missing persons report made out by the police officer who had taken Mrs. Krayer's telephone report of her husband's disappearance. This report purports to show that Mrs. Krayer told the officer that her husband had left in 1957 intending to kill himself but that he had returned stating that he had lost his nerve. The report further purports to show that Mrs. Krayer told the officer that he had recently been upset about her former husband's failure to make child support payments and that she feared he had bolstered his courage and might kill himself. The report contains what is said to be the language of the note left by Krayer the night of his disappearance: "I think it best that I do it this way. Remember that I love you, no matter what happens."

The note has disappeared and Mrs. Krayer denies that it contained the language in the police report, but she was vague as to just what it did say. Mrs. Krayer's brother, who saw the note, was likewise vague about its contents.

The only clues to Krayer's activities between the time he left home and his death were found in an automobile repair order of a Denton, Texas, garage, dated April 25, the day after his disappearance from home, and a ticket stub to a Denton movie theater also dated April 25. The repair order showed that he was charged $1.00 for the tightening of a bolt on the bumper of his car.

Krayer's body was found in his automobile in a lonely wooded area near Phenix City, Alabama. The Alabama state toxicologist estimated that Krayer had been dead about seven days when discovered on May 8. His body was in a sitting position behind the steering wheel. His right hand lay on the seat. His left hand was resting on the lower inside circumference of the steering wheel, held up and away from the body by the wheel. The palm was toward the body. The fingers were bent, and slightly spread apart, somewhat as if the hand were lightly grasping a spherical object. In the space between the hand and the body lay the revolver, resting on the abdomen. The revolver was upside down, the stock almost touching Krayer's belt buckle. The barrel pointed to the left. It is undisputed that Krayer was ambidexterous; he wrote with his left hand.

In the seat beside the body lay billfold-size photographs of Krayer's wife and children, his eyeglasses, and his wallet containing other items not necessary to list.

The key was in the ignition, the passenger door locked, and all the windows were rolled up. Other items found in the car included an almost empty half-pint bottle of whiskey, clothes on hangers, and a cocktail napkin with a girl's name written on it. Krayer's diamond wedding ring was found in the clothes hanging in the back seat, and his gold wrist watch was on his body.

The revolver found on the body was shown to have been the same gun purchased by Krayer two days before he disappeared. The nine-round magazine contained eight unfired hollow point cartridges and one that had been fired. A box of .22 caliber long rifle hollow point cartridges was found in the glove compartment of the car. Investigators could account for only 49 of the box of 50 cartridges, counting the nine found in the magazine of the gun.

· The bullet entered Krayer's skull at a point one inch behind his left eye, passed through his brain, and lodged just inside the right side of the skull in line with the top of his right ear. The bullet was badly mutilated, as—according to the toxicologist —hollow points generally are when they have penetrated flesh. The mutilation of the bullet made it impossible to determine whether the bullet had been fired by the gun found on the body.

There was no evidence of a struggle. Decomposition of the body made it impossible to take fingerprints anywhere inside the car. No footprints were found around the car. There was testimony that it had rained between the time of Krayer's death and the time his body was discovered.

Respondent argues that suicide has not been established as a matter of law because the evidence reasonably supports the theory that Krayer was with a stranger, who robbed and killed him.

There is testimony by a neighbor that Krayer was in good spirits before he disappeared from home. Respondent argues that the Denton garage mechanic's description of the man who had come in to have the bumper bolt tightened shows that someone other than Krayer was driving the car. Respondent established without dispute that Krayer was ordinarily not a drinking man and argues that the presence of the nearly empty whiskey bottle and the napkin with the girl's name on it tend to show that another person had been in the car. The police report introduced into evidence by petitioner shows that Mrs. Krayer told the officer that he had $109.00 with him when he left home. Respondent argues that these facts taken together reasonably support the theory that Krayer fell in with a stranger who robbed and murdered him.

Even if it be conceded that the evidence tends to show another person had at some time been with Krayer, there is no evidence of this stranger's presence at the time of death, or that such stranger shot Krayer. On this evidence the jury had to resort to pure fantasy and speculation in order to conclude homicide. Nor does the position

of the revolver with the barrel pointing in the wrong direction add anything.

Respondent's contention seems to be that this court must judicially know that Krayer's hand would tighten its grip the moment the bullet entered the brain and that this would cause the gun to fall with the barrel pointing to the right rather than to the left. There is no testimony that the position of the gun was inconsistent with suicide. In fact, the Alabama state toxicologist testified that Krayer would not have died immediately but would have been made unconscious by the first impact of the bullet and would have relaxed, allowing the gun to fall free of his hand.

After reviewing the whole record and disregarding that part of petitioner's evidence which is disputed by respondent, we are of the opinion that reasonable minds could not reach any other conclusion than that Krayer's death was suicide.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

SMITH, WALKER and STEAKLEY, JJ., dissenting.

STEAKLEY, Justice (dissenting).

I am unable to agree that the circumstances rule out any hypothesis except that the insured committed suicide, or are conclusive against the jury finding that he did not. True it may be that the more reasonable hypothesis is suicide, and that such is the preponderance of the evidence. But these are questions for jury decision, not ours.

The majority relies on Combined American Insurance Co. v. Blanton, Tex., 353 S.W.2d 847. In my view the facts here are considerably less supportive of the suicide hypothesis than in Blanton. But more to the point is that Blanton was a suit to recover for loss of life by *accidental means* and our holding was that "there is no evidence which would support a reasonable inference that Blanton's death was caused by accidental means." We distinguished United Fidelity Life Insurance Co. v. Adair (Tex.Com.App.), 29 S.W.2d 944, in which the Court refused to disturb a jury finding that the deceased did not commit suicide, by recognizing that in Adair the suit was on a life policy and there, as here, the insurer relied upon the *defense* of suicide; whereas, in Blanton "[s]uicide was not an affirmative defense. The negative of suicide was an element of Plaintiff's case." The Court of Civil Appeals in the case at bar recognized this distinction and followed Blanton, with which I agree, in disregarding the jury finding against suicide with respect to the phase of respondent's suit seeking recovery for accidental death.

The facts here are considerably less supportive of suicide than in Grand Fraternity v. Melton, 102 Tex. 399, 117 S.W. 788, where, among other things, there were witnesses upon the scene after the pistol shot and before death, and there was actually no basis for any hypothesis except suicide. Nor am I able to reconcile the majority decision here with the judgment we left undisturbed in Great Southern Life Insurance Co. v. Watson, Tex.Civ.App., 343 S.W.2d 921, writ ref. n. r. e. The judgment was for both life and accidental death benefits. The deceased was found dead with a .22 pump rifle by his body. There were no eye witnesses. He had been shot twice. The only way two shots could have been fired was by working the pump lever mechanism of the rifle. One empty shell was found near the body and the other was in the rifle. It was argued by the insurer that it was beyond probability that the deceased accidentally shot himself twice. But there were other circumstances favorable to a non-suicidal death and a majority of the Court of Civil Appeals concluded that the judgment of the trial court should stand.

It was a difficult, perhaps impossible, burden in the case at bar for respondent to

prove that the insured met his death from means other than suicide. It was an equally difficult, if not impossible, burden for petitioner to prove that the insured committed suicide. The law properly presumes against suicide.

The facts and circumstances are reviewed in the majority opinion. Disputes in the testimony are recognized. There are various matters of particular emphasis. Proof could not be made that the bullet which killed the deceased was fired from the gun found with him. The discovery of the badly decomposed body in a remote and isolated location seven days after death, during which time the automobile was closed and without air circulation, rendered many facts unavailable. The body in its state of decomposition could not show any evidence of a struggle. The taking of finger prints was not possible. Intervening rains prevented any evidence of foot prints or tire marks of another automobile. The circumstances suggested the possibility of the involvement of an unknown person, or persons. Persons committing foul play on the deceased could have done so either at the location of the automobile or elsewhere; if the latter, the deceased and his automobile could have been driven to the isolated location and the body and surrounding circumstances there contrived to give the appearance of suicide. The isolated location afforded ample time for the possible assailants to go far away.

Even granting that the foregoing is speculation, it must be recognized that what actually happened is necessarily in the field of speculation in the sense that we are compelled to reason and theorize about a matter which does not admit of direct proof or substantiation. We surely are not to say that the finding of a body in circumstances strongly indicative of suicide is always to be held conclusive. It is too well known that foul play can be made to appear as suicide and that accidents can so appear. We can go too far in supplanting fact findings

of a jury with our strong beliefs about what actually occurred. I think the majority has done so here.

SMITH and WALKER, JJ., join in the dissent.