DALLAS COUNTY FLOOD CONTROL DISTRICT NO. 1, Appellant,

v.

Charles A. CROSS, Provident National Bank Denton, The National Bank of Texas at Fort Worth, B.K. and Henry Coit, Appellees.

No. 05–90–00582–CV.

Court of Appeals of Texas, Dallas.

July 15, 1991.

Rehearing Overruled Sept. 11, 1991.

James D. Blume, Dallas and Joe Putnam, Irving, for appellant.

Charles F. Guittard and William M. Jones, Dallas, for appellees.

Before ROWE, LAGARDE and OVARD, JJ.

## OPINION

OVARD, Justice.

This case concerns the legality of two real estate purchases by a governmental agency. In separate transactions, Dallas County Flood Control District No. 1 (the District) bought permanent flood control easements over two tracts owned by Charles A. Cross (Cross). At the time the deals were struck, Cross was the District's presiding officer. The voters dismissed Cross at the next election. The new leadership of the District filed this lawsuit to invalidate the two transactions. The District pleaded, among other things, that two of Cross's allies on the District's governing board violated statutory conflict-of-interest rules by voting to approve the transactions with Cross after having received money from him. *See* TEX.LOCAL GOV'T CODE ANN. chapter 171 (Vernon 1988 & Supp.1991). Based principally on the conflict-of-interest claim, the trial court awarded the District a summary judgment that declared the two transactions invalid. Cross appealed. This court determined that the District's summary judgment evidence raised a fact issue

on its conflict-of-interest claim but failed to prove the claim conclusively. We remanded the case for a full trial on the merits. *See Cross v. Dallas County Flood Control Dist. No. 1*, 773 S.W.2d 49 (Tex.App.— Dallas 1989, no writ).

That trial has occurred. After the close of evidence, the parties submitted their case on twenty-two (22) special issues. The jury answered eleven issues favorably to the District and eleven favorably to Cross. Some of the jury's answers conflicted. The trial court, without explaining how it resolved the conflicts, awarded judgment to Cross. The District appeals. We hold that the two transactions are voidable by the District. We reverse the judgment of the trial court and render a declaratory judgment for the District.

## FACTUAL BACKGROUND

### THE TEMPORARY EASEMENT

The District is a governmental agency and a body politic. The Texas Legislature organized it, pursuant to article sixteen, section 59 of the Texas Constitution. The District is wholly contained within Dallas County. It exists to design and implement a plan for flood control and flood plain reclamation for the land adjoining Bear Creek, near the Dallas–Fort Worth International Airport. The District is empowered to acquire property, by agreement or by condemnation, and to build improvements on the property. Subject to voter approval, the District may also sell bonds and collect taxes to fund its work. A five-member Board of Directors (the Board) governs and administers the District.

The District's voters approved a $19 million bond proposal in June 1982. In August 1983, the Board adopted a reclamation plan. The plan would provide flood protection by widening the Bear Creek channel and would reclaim low-lying land by filling it above the 100–year flood plain. In September 1983, the District began negotiations with General Portland Company to acquire a right of way over a 13.8–acre tract located along Bear Creek. Ninety percent of the tract lay within the 100–year flood plain, some of it within the flood way. The Board authorized $2500 per acre for purchase of the right of way.[1]

In October 1983, Cross bought the 13.8–acre tract from General Portland. He paid $10,000 per acre or $138,000. Cross won election to the Board on April 7, 1984. His fellow directors chose him as President of the Board of Directors. Cross held that position until the voters retired him from the Board in April 1986.

Between October 1983, when Cross purchased the 13.8–acre tract from General Portland, and April 7, 1984, when Cross won his seat on the Board, the District filed a condemnation suit against the tract. Cross won a reprieve from condemnation on July 16, 1984. He granted the District a temporary construction easement across 11.9 acres, and he also pledged to let the District build the permanent improvements required by the reclamation plan. In exchange, the District agreed to dismiss the condemnation suit and to prepare engineering drawings for the reclamation project showing a concrete-lined channel through Cross's tract. Both parties agreed that, in any future condemnation proceedings filed within four years of the granting of the temporary easement, the date of the taking would be July 18, 1984.

### THE NEW BOARD OF DIRECTORS

In April 1985, the composition of the Board changed significantly. Two new directors, Melvin H. Delaney (Delaney) and Thomas Fleener (Fleener) won seats as write-in candidates.[2] Delaney was a real estate broker. He did business under one partnership (Cost Plus Builders) and several d/b/as.[3] Delaney's exact connection to

---

1. In the context of this case, there is no difference between an easement and a right of way. We use the terms interchangeably.

2. The number of voters in the District is small. Fleener and Delaney received 30 and 27 votes respectively out of 64 votes cast for four candidates.

3. D/b/a means "doing business as". A d/b/a is an assumed name for a business. Delaney's d/b/as were sole proprietorships.

Cross is unclear, but Delaney testified that Cross encouraged him to run for a seat on the Board. Fleener was a word processing and records management specialist. Cross and Fleener met in January 1985. Cross answered Fleener's classified advertisement offering word processing services. The District hired Fleener to type minutes of Board meetings. Cross personally paid Fleener $920 in February 1985, to prepare materials for a White House Conference on small business to be held in Washington. Cross also persuaded Fleener to run for the Board. After the April 1985 election, the Board consisted of Cross, as President, Delaney, as Vice–President, Fleener, as Secretary, Cecil Pope, as Assistant Secretary and Assistant Treasurer, and Carr Collins, Jr., as Treasurer.

A few months after his election, Fleener made a profitable business connection through his association with Cross. On October 5, 1985, Terry Sexton, Cross's son-in-law, paid Fleener a $2500 retainer for records management services. Sexton sent another $1000 on November 18, 1985. During autumn 1985, Sexton was a college student. He conducted no business except mowing lawns. Sexton's checks listed the Cross family ranch as his address.

## THE DONATION

In mid-May 1985, Cross organized a large barbecue in Irving. He invited Jackie Townsell, an Irving City Councilwoman. Cross told Townsell that he would make a public donation at the barbecue for park construction in Irving. Townsell attended the barbecue and Cross handed her a $12,000 cashier's check. Cameras captured the moment for posterity. Cross announced that the money would fund construction of a park near Shady Grove Lane (within the boundaries of the District.) The cashier's check showed Cross as the maker and CAC Park Fund as the payee. Townsell testified that Cross gave her the check and that moments later Cross told Pope to take the check from her. According to Townsell, she gave Pope the check, and she did not know what happened to the check after Pope took it.

Cross testified that, when he wrote the check, he intended the money to benefit Park People, a non-profit Texas corporation. He said that he wanted CAC Park Fund to become a division of Park People. Park People never got the money. According to Cross, Delaney had agreed with Pope and Townsell to build the park improvements at cost. Cross stated that he had nothing to do with the agreement, but that he allowed it to proceed. Cross said that he warned Delaney not to expect more money unless he got "a full accounting for every dime that was spent." Pope handed the check to Delaney. Delaney deposited the $12,000 in an account belonging to one of his d/b/as, "Greenbelt Development Company." The Greenbelt Development account never contained any money other than the $12,000 from Cross.

Delaney spent the $12,000 on various things, but he did not build the park. Delaney paid Fleener a $2500 retainer and a $1000 quarterly fee out of the Greenbelt Development account for "records management consulting," ostensibly related to the park project. The first check, for $2500, was dated October 10, 1985. The second check, for $1000, was dated November 12, 1985. Delaney could not recall if he paid later quarterly fees to Fleener from the Greenbelt Development account or from another account. He did remember that he used all the unspent money in the Greenbelt Development account to pay bills for Cost Plus Builders, his partnership. Fleener testified that he started work on a spreadsheet for Delaney after receiving the initial $2500, but he admitted that he never delivered any work product in exchange for the $3500. He said Delaney did not give him enough information to complete the spreadsheet. Councilwoman Townsell testified that someone repaired and repainted a small house on the park site but that the park improvements were never made. The record reveals no accounting to Cross for the expenditure of the $12,000.

## THE AUGUST TRANSACTION

At some point in summer 1985, the Board decided (informally) to give up the tempo-

rary easement on Cross's 13.8–acre tract and buy a permanent easement. The Board met in late August to accomplish that purpose. The minutes reflect that the Board met on August 27, 1985, continued the meeting in closed executive session on August 28, 1985, and reconvened in open session on August 30, 1985. Apparently, in the August 28, 1985 executive session,[4] the Board voted to purchase a permanent easement on a 4.611–acre portion of Cross's 13.8–acre tract. No minutes exist of the negotiations or of the vote confirming the deal. Cross was present at the executive session, though no one contends that he voted on the transaction.

In exchange for the permanent easement, the District agreed to pay Cross $239,580.84, or $51,958.54 per acre. The District also agreed to: (1) maintain all structures on the property; (2) provide grassy areas on the property; (3) maintain liability insurance in the amount of $2,000,-000, with Cross shown as an additional insured; (4) support Cross in any zoning or building requests regarding the property; (5) provide engineering drawings showing a completely concrete-lined channel through Cross's property; (6) permit Cross to build structures over the Bear Creek channel; and (7) allow Cross to use all the District's right of way for recreation and horseback riding. The District also agreed to give back its easement over any property that became surplus. A partial seller's statement, dated August 29, 1985, showed the transfer of the 4.611–acre easement and listed a selling price of $239,580.84 and other valuable consideration. Cross received a check for $239,580.84 no later than August 29, 1985. The Board did not disclose the transaction publicly until November 12, 1985. On cross-examination, Cross testified that negotiations for the August 28–29, 1985 transaction began sixty to ninety days earlier.

## THE NOVEMBER TRANSACTION

On October 7, 1985, the District filed a condemnation action against 8.233 acres of the remaining portion of the 13.8–acre tract. (The suit left out approximately one acre of the original tract.) The District's petition recited that the District sought to acquire a permanent flood control easement in place of the temporary easement. The Board held a public meeting on November 12, 1985. The minutes reflect that Cross announced to those present that the District had acquired right of way from several landowners, including himself. He said that the District had reached a partial settlement with him that covered a portion of his tract and that the District had filed a condemnation suit against the balance of the land it needed. Cross indicated that he was negotiating with the District in an effort to settle the condemnation action. Robert Nelson, a former President of the Board and a citizen in attendance at the meeting, asked where in the Board's minutes he could find the Cross right of way acquisition. Cross replied that the prior acquisition (the 4.611 acres) was only a partial agreement and that the District did not disclose the terms of partial agreements. Cross said that the Board would make public the terms of any final settlement it reached in executive session. Delaney explained that, after each executive session, the Board came back into open session and approved a motion to accept and act upon the items discussed in executive session. Cross re-emphasized that the Board did not make final decisions in executive session.

After three hours and forty-five minutes of open meeting, the Board moved into executive session. The open meeting reconvened about one and a half hours later. Delaney presided. Fleener moved that the Board and the District's lawyer proceed, as discussed in executive session, on the Cross right of way purchase. According to Fleener's motion, the Board had voted to buy a permanent easement on 8.233 acres for $1,201,408.70 or approximately $3.35 per square foot. The deal required the District to pay $65,000 in cash and to issue

---

**4.** Generally, when a body meets in executive session, no members of the public are present, and no minutes of the discussion are kept.

notes for the balance. Fleener's motion passed by a vote of 3–0. Cross abstained. One seat was vacant due to the death of Carr Collins, Jr. Under the District's governing rules, the motion needed three affirmative votes in order to win approval. The meeting adjourned a few minutes later.

Two days later, on November 14, 1985, the District and Cross signed a document entitled "Compromise and Settlement Agreement" (Compromise and Settlement Agreement or the Agreement), which purported to settle the condemnation action filed on October 7, 1985. The District contracted to pay Cross $1,307,954.20 or $3.64 per square foot in exchange for a permanent easement over the 8.233 acres. Pursuant to the Agreement, the District paid $65,000 in cash and executed fifty-one promissory notes for the balance, $1,242,-954.20. The District also gave Cross a right of first refusal to buy back any surplus land at $3.64 per square foot. Finally, the Agreement purported to ratify and amend the August 28–29, 1985 transaction. The amendment gave Cross a right of first refusal on surplus land in the 4.611–acre tract and obligated the District to convey to Cross its interest in 3.46 acres, somewhere in the District, when that much unneeded land became available.

## THE REACTION

The posting of the minutes of the November 12, 1985 meeting sparked a revolt. The Jim Sallo Company, a taxpayer in the District, and several other landowners filed a lawsuit against Cross and the District in December 1985. They sought to rescind the Agreement and to block the sale of bonds necessary to fund Cross's promissory notes. The Texas Attorney General's office refused to authorize the bond sale until the lawsuit reached some resolution. In April 1986, before the lawsuit went to trial, Cross and Pope were defeated at the polls. (Fleener and Delaney did not have to face the voters until 1987.) Three new members, Robert Nelson, Tony Delbalzo, and Helen Carr, won election to the Board.

The new Board wanted to proceed with right of way acquisition for other tracts while it litigated with Cross. The District needed to sell bonds to fund those acquisitions. The lawsuit against Cross and the District prevented state authorization for a bond sale. The parties signed a truce September 9, 1986. It settled none of the major issues, but it allowed the District to operate. The original plaintiffs withdrew their suit against Cross, and Cross agreed not to challenge the District's authority to sell bonds. The Board pledged to pay Cross an additional $200,000 in cash out of bond proceeds. The Board also agreed to place in escrow an additional $1,042,954.20 in bond proceeds. In return, Cross pledged to put the promissory notes in escrow. Cross and the District agreed to share equally the interest income on the escrowed money, pending the outcome of future litigation. Finally, neither party waived or compromised any of its claims or defenses. The cease-fire cleared the legal impediment to Attorney General approval of the proposed bond sale. The sale occurred in November 1986.

## PROCEDURAL HISTORY OF THE CURRENT LAWSUIT

The District brought this lawsuit against Cross in March 1987. The District asserted numerous causes of action and sought two primary remedies: (1) declaratory judgments that the August transaction and the November transaction were voidable due to illegality; and (2) a judgment for damages under a claim that Cross violated the Texas Deceptive Trade Practices Act. The trial court awarded the District summary judgment on three of its declaratory judgment causes of action. Cross appealed. We concluded that several genuine issues of material fact existed, and we remanded the case for a full trial. *See Flood Control*, 773 S.W.2d at 55. The case started over in the trial court.

At the close of evidence, the parties submitted the case to the jury on twenty-two special issues. The jury answered most of the questions related to illegality of the transactions favorably to the District. The jury answered favorably to Cross the ques-

tions related to valuation of the right of way acquired. Some of the findings conflicted. The jury found that the prices the Board agreed to pay Cross were unconscionable but also found that the prices equalled the fair market value of the land. The unconscionability finding established the basis for a DTPA judgment. But the specific finding that the District agreed to pay no more than the fair market value meant that the District suffered no damages. The jury also found that the District was estopped to assert that its prior transactions with Cross were illegal. The trial court decreed that Cross recover from the District "the sum of THREE DOLLARS AND 64/100 ($3.64) per square foot for the 8.233 acre easement and TWO HUNDRED THIRTY–NINE THOUSAND EIGHT HUNDRED AND no/100 DOLLARS ($239,800.00) for the 4.611 acre easement, less the sum of FIVE HUNDRED NINETY–THREE THOUSAND SIX HUNDRED THIRTY–EIGHT AND 85/100 dollars ($539,638.85) which has been previously paid." According to the trial court's formula, Cross would be entitled to collect $1,005,572.50, plus postjudgment interest. The trial judge did not reveal which jury findings he used and which ones he disregarded.

In twenty-one points of error, the District reasserts essentially the same arguments it made to the trial court: (1) the fifty-one promissory notes represent illegal debt because the voters of the District did not specifically authorize the issuance of the notes, and the District did not have sufficient funds available at the time of issuance to pay off the notes within one year; (2) the District is not subject to estoppel because it is a governmental body, and in the alternative, there is no evidence to support an estoppel; (3) the transactions with Cross represent an unconstitutional gift of public funds; (4) the permanent easement acquisitions from Cross are void because common law conflict-of-interest rules precluded Cross from selling land except by condemnation to the agency he served; (5) the permanent easement acquisitions from Cross are voidable because statutory conflict-of-interest rules prohibit-

ed Fleener and Delaney from voting on the November 12, 1985 resolution that approved the transactions, and the resolution could not have passed without the affirmative vote of both of them; (6) the permanent easement transactions are voidable because Cross breached a fiduciary duty to the District; (7) the District is entitled to recover damages from Cross because he violated the DTPA, and the District is a consumer; (8) the permanent easement transactions are voidable because the Board approved them in a secret meeting that violated the Texas Open Meetings Act; (9) the trial court erred by admitting into evidence exhibits and testimony regarding the values of land not comparable to the Cross tract. Cross controverts all of the District's arguments but asserts no cross-points of error. We will analyze the District's second (no estoppel), fifth (statutory conflict of interest), and eighth (violation of Open Meetings Act) arguments. Discussion of the remainder of the District's arguments is unnecessary for the disposition of this appeal. We decline to address them.

## LEGAL ANALYSIS

### STATUTORY CONFLICT OF INTEREST

■ Texas law seeks to curtail self-dealing by public officials. Since September 1, 1987, chapter 171 of the Texas Local Government Code has regulated the manner in which local government officials may transact business with the public agencies they serve. In November 1985, the time of the transaction the District seeks to avoid, an earlier statute prevailed. *See* Act of May 30, 1983, 68th Leg., R.S., ch. 640, 1983 Tex.Gen.Laws 4079 (codified at TEX.REV. CIV.STAT.ANN. art. 988b). Section 3 of the 1983 act provided in relevant part:

(a) A local public official commits an offense if he knowingly:

(1) participates in a vote or a decision on a matter involving a business entity in which the local public official has a substantial interest if it is reasonably foreseeable that an action on the matter would confer an economic benefit to the business entity involved[.]

(b) An offense under this section is a Class A misdemeanor.

A violation of section 3 rendered the transaction voidable by the public agency if "the measure that was the subject of the action involving the conflict of interest would not have passed the governing body without the vote of the person who violated this article." Act of May 30, 1983, 68th Leg., R.S., ch. 640, § 6, 1983 Tex.Gen.Laws 4079, 4081 (codified at TEX.REV.CIV.STAT.ANN. art. 988b, § 6).

The District asserts that Delaney and Fleener violated article 988b, section 3 by participating in the November 12, 1985 decision to authorize the November 14, 1985 "Compromise and Settlement Agreement" with Cross. If so, their actions rendered the Agreement voidable by the District. The minutes of the November 12, 1985 meeting recite that the Board discussed the Agreement in executive session. The Board apparently decided to buy the 8.233–acre permanent easement from Cross and to "ratify"[5] the prior purchase for $239,-580 of the 4.611–acre easement. The Board came out of executive session and passed a motion that formally approved its decision. Without that motion, the Board would have had no authority to settle its condemnation suit against the 8.233 acres. Like any governing body of a public agency, the Board must vote on policy decisions. The minutes reveal that Cross abstained from voting on the motion and that Delaney and Fleener voted to pass the motion. The District challenges the legality of their votes.

To prove that Delaney and Fleener violated the local government conflict of interest statute, the District must show five elements:

(1) that Delaney and Fleener were local public officials;

(2) that they knowingly participated in a vote or decision;

(3) on a matter involving a business entity;

(4) in which the local public official has a substantial interest;

(5) that it was reasonably foreseeable that an action on the matter would confer an economic benefit to the business entity involved.

Act of May 30, 1983, 68th Leg., R.S., ch. 640, § 2(a)(2), 1983 Tex.Gen.Laws 4079, 4080. Cross does not contest elements one, two, three, and five. Statutory definitions make clear that Delaney and Fleener were local public officials and that Cross was a business entity. (Under the statute, an individual can be a business entity.) Delaney and Fleener knew the nature of the motion on which they voted, and they could reasonably foresee that Cross would receive an economic benefit from the District paying him $1.2 million.

The critical issue is whether Delaney and Fleener had a substantial interest in Cross's business affairs. According to the statute, "[a] person has a substantial interest in a business if ... funds received by the person from the business entity exceed 10 percent of the person's gross income for the previous year." Act of May 30, 1983, 68th Leg., R.S., ch. 640, § 2(a)(2), 1983 Tex. Gen.Laws 4079, 4080. During the twelve months before November 12, 1985, Fleener received $920 directly from Cross, $3500 from Greenbelt Develpment (which never had any money except for the cashier's check from Cross) and $2500 from Terry Sexton, Cross's son-in-law. The payments totalled $6920. Fleener's 1985 tax return showed a total income of $20,877. He estimated his income between November 14, 1984 and December 31, 1984, at $3521.40. The figures totalled $24,398.40. Delaney received Cross's $12,000 cashier's check in May 1985. Although the check listed CAC Park Fund as the payee, Delaney deposited the check in his Greenbelt Development d/b/a and used most of the proceeds to pay bills owed by Cost–Plus Builders. Delaney's 1985 tax return showed an income of $24,072.77. The trial court submitted to the jury two special issues that asked whether Delaney or Fleener received from Cross more than ten percent of their gross income in the twelve months prior to No-

---

**5.** Ratification was not possible at that time. See    discussion of the Open Meetings Act.

vember 12, 1985. The jury answered both questions affirmatively.

On appeal, Cross contends that there is no evidence to support the jury finding. Cross draws a distinction between direct and indirect payments. He argues first that there is no evidence that he made direct payments to Delaney or Fleener, except for the $920 payment to Fleener for preparation of White House Conference materials. ($920 is less than ten percent of Fleener's income for the twelve months prior to November 12, 1985.) Cross concedes that Delaney somehow got the $12,000 cashier's check, but he points out that he gave the check to Councilwoman Townsell, not Delaney, and that the check listed CAC Park Fund, not Delaney or Greenbelt Development, as payee. Additionally, Cross asserts that "there is no evidence that Delaney himself, as opposed to Cost–Plus Builders, received any benefit whatsoever" from the cashier's check. Cross challenges the existence of evidence that Cost–Plus Builders enjoyed any benefit from the $12,000 check, as opposed to using the funds solely to reimburse its out-of-pocket expenses for doing work on the park site.

Cross also denies that he made indirect payments to Delaney and Fleener. The statutory definition of "substantial interest" makes no distinction between funds received directly from the business entity and funds received indirectly. However, indirect payments were a thorny issue in the first appeal of this case. Justice Rowe's opinion in that appeal described the dilemma:

> Limiting [the statutory definition of substantial interest] to funds directly received from the business entity would seriously undermine its effectiveness in deterring self-dealing among our public officials. On the other hand, the indiscriminate inclusion of all funds indirectly received from a business entity no matter how remote would far exceed the scope of the statute.

*Flood Control,* 773 S.W.2d at 55. We resolved the policy dilemma by holding that the definition of substantial interest "en-compasses funds indirectly received from a business entity only to the extent that the entity participated in some significant way in causing the intervening party to engage in the particular transaction with the public official." *Id.* Cross argues that there is no evidence that he paid Delaney indirectly because, he asserts, there is no evidence that he participated in causing Councilwoman Townsell to deliver the cashier's check to Delaney. Cross cites the undisputed testimony that Councilwoman Townsell handed the check to Pope, not Delaney. Cross also contends that there is no evidence of indirect payments (as defined by Justice Rowe) to Fleener. He points to the fact that Delaney paid Fleener the $3500 from Greenbelt Development. Cross argues that there is no evidence that he controlled Greenbelt Development and no evidence that he caused Delaney to pay Fleener. Citing Justice Rowe's previous opinion, Cross urges that, on the record before the court, the jury could not permissibly find that Fleener received indirect payments from him.

■ We agree with Cross that there is no evidence that he made direct payments to Delaney or Fleener, except for the $920 to Fleener. However, indirect payments will suffice for purposes of the conflict-of-interest statute if the business entity (Cross) participated in causing the funds to reach the public officials (Delaney and Fleener). That is the essence of Justice Rowe's discussion in the first appeal. *See Flood Control,* 773 S.W.2d at 55. We also agree with Cross that there is no direct evidence that he caused Pope to give the cashier's check to Delaney and no direct evidence that he caused Delaney to pay Fleener.

■ However, juries do not need direct evidence on every point. Facts can be proven by circumstantial evidence. *Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 780 (Tex.1963); *Walter Baxter Seed Co. v. Rivera,* 677 S.W.2d 241, 244 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts

proved in the case. *Id.* We shall examine whether the jury had enough circumstantial evidence to find that Cross directed to Fleener and Delaney funds that represented more than ten percent of their gross income in the twelve months before November 12, 1985.

Cross bought the 13.8–acre tract in October 1983, for $138,000 or $10,000 per acre. Cross won election to the Board of the District in April 1984. The following year he encouraged Delaney and Fleener to run for positions on the Board, and they won. On or about August 28, 1985, the District Board (which included the newly elected Fleener and Delaney) purchased an easement on 4.611 acres from Cross for $239,-580 or $51,958 per acre. The Board voted in closed executive session and kept no minutes of its deliberations. On November 12, 1985, the Board agreed in executive session to buy from Cross an easement over 8.233 acres for $1,307,954.20 or $158,-867.26 per acre. The price equalled nearly sixteen times what Cross paid two years earlier. Delaney, Fleener, and Pope voted for the motion that authorized the transaction. The highly unusual nature of the transactions (the secrecy and the stratospheric prices) is a suspicious circumstance.

The transactions related to the donation of the $12,000 cashier's check provide additional circumstantial evidence. When Cross presented the cashier's check, he announced that he intended for the money to fund improvements at the park site. Councilwoman Townsell testified that Cross presented her the check in front of the camera and later told Pope to retrieve it. Cross admitted that he intended for Pope to give Delaney the check. Delaney testified that he had agreed with Cross to accept the check as reimbursement for the expenses of building the park. Delaney received the check from Pope and deposited the check in Greenbelt Development, his d/b/a. According to Councilwoman Townsell, the park improvements were never built, and the site was never used as a park. No evidence contradicts her testimony. No accounting exists for the expenditure of $12,000, despite Cross's testimony that he expected one.

Delaney testified that he paid $3500 from the $12,000 to Fleener for records management related to the park project. Fleener admitted that he produced no work product for the $3500. Delaney confirmed that he spent most of the remainder of the $12,000 paying bills for Cost–Plus Builders, a partnership he owned with another man. As a partner in Cost–Plus Builders, Delaney was jointly and severally liable for its debts. TEX.REV.CIV.STAT.ANN. art. 6132b, § 15 (Vernon 1970). It is common knowledge that partners are liable for the debts of their partnership. To the extent he avoided paying those debts out of other funds, Delaney received a financial benefit from the cashier's check.

Delaney's tax return for 1985 shows income of $24,072.77. According to the conflict-of-interest statute, the relevant time period for determining "substantial interest" is the twelve months prior to November 12, 1985. There is no direct evidence of Delaney's income between November 12, 1984 and December 31, 1984. However, the items of income listed on the 1985 return and Delaney's testimony indicate that his income in late 1984 varied little from his income in late 1985. Delaney's largest items of income were his community property interest in his wife's salary as a counselor in the Richardson Independent School District and his community property right in $4700.16 in interest on bank deposits. Delaney testified that his wife had worked in the same job for eleven years. Delaney also testified that his various business activities normally produced only a small income over expenses. We conclude that the jury had enough evidence to estimate, with reasonable certainty, that Delaney's gross income between November 13, 1984, and November 12, 1985, totalled about $25,000.

◼ We now summarize the facts that support the jury finding. Delaney voted on November 12, 1985, to have the District buy an 8.233–acre easement from Cross for sixteen times the price Cross had paid to purchase the land two years earlier. In May 1985, Cross handed Councilwoman

Townsell a $12,000 cashier's check, ostensibly for park construction. At the time Cross "donated" the check, he intended that Delaney receive it. Delaney deposited the check in one of his own accounts. Delaney never built the park and never accounted to Cross for the money. Delaney spent at least a large portion of the $12,000 to pay his own bills. Finally, Delaney's income for the twelve months prior to November 12, 1985, approximated $25,000. We conclude that proof of these facts provided the jury with ample circumstantial evidence to find that Cross directed to Delaney money that exceeded ten percent of Delaney's gross income in the twelve months prior to November 12, 1985. *See Walter Baxter Seed Co.*, 677 S.W.2d at 244. The conflict-of-interest statute does not require proof of evil motives. It suffices that Cross directed the money to Delaney, and Delaney received it as gross income. Act of May 30, 1983, 68th Leg., R.S. ch. 640, § 2(a)(2), 1983 Tex.Gen.Laws 4079, 4080.

Since the only contested issue was whether Delaney had a "substantial interest," as defined by statute, in Cross's business affairs, we hold that the District has met its burden of proof. When Delaney voted on November 12, 1985, to approve the Compromise and Settlement Agreement with Cross, he violated the then prevailing conflict-of-interest statute. The motion to approve the Agreement could not have passed without Delaney's affirmative vote. His conflict of interest rendered the Agreement voidable by the District, unless something suspended the operation of the statute. (See discussion of estoppel.)

We now analyze the evidence supporting the jury finding that Cross directed to Fleener money that exceeded ten percent of Fleener's gross income in the twelve months before November 12, 1985. Fleener received income of $20,877 in 1985. From November 14, 1984 to December 31, 1984, he earned $3521.40. In the twelve months prior to November 12, 1985, his income did not exceed $24,398.40. Fleener joined Delaney and Pope in voting to approve the purchase of the 8.233 acre easement. Cross paid Fleener $920 in February 1985, for preparing materials for a conference in Washington D.C., and Cross encouraged Fleener to run for the Board. Delaney paid Trinity West Financial, Fleener's d/b/a, $2500 on October 10, 1985, and $1000 on November 12, 1985. Delaney paid both invoices from Greenbelt Development's account. Greenbelt never had any money except for the $12,000 from Cross's cashier's check. Fleener never completed any work for the $3500. On October 5, 1985, Terry Sexton, Cross's son-in-law, paid Trinity West Financial a $2500 retainer for records management. At the time, Sexton was a college student. He mowed lawns for extra money and had no other business activities. Sexton's check listed an address, 1617 County Line Road. Cross was registered to vote at that address. Fleener admitted that he did no work for Sexton until at least January 1986.

The critical question is whether Cross directed money to Fleener through Delaney or Sexton or whether they paid Fleener entirely on their own initiative. Delaney did no work in exchange for the $12,000. He gave Fleener $3500, for which Fleener produced no work product. A jury reasonably could have drawn the inference that Cross intended for Delaney to share his largesse with Fleener. Sexton was a college student who mowed lawns for extra income. Common experience suggests that a one or two man lawn-mowing business does not need $2500 in computerized records management services. Common experience also suggests that college students who mow lawns for extra money usually do not have $2500 in extra change. Sexton was Cross's son-in-law. A jury could have inferred that Cross used Sexton as a conduit to pay Fleener. We conclude that the circumstantial evidence was sufficient for the jury to find that Cross procured for Fleener either the $3500 from Delaney or the $2500 from Sexton. Either sum, when added to the $920 Cross paid Fleener directly, exceeds ten percent of Fleener's gross income for the twelve months before November 12, 1985. Our determination is consistent with our conclusion in the first appeal of this case. We

concluded then that the District's evidence raised a fact issue on whether Cross directed money through Delaney to Fleener, but that the evidence failed to prove the transfer conclusively. *Flood Control*, 773 S.W.2d at 55. The evidence again raised a fact issue. The jury resolved it. Cross repeatedly denied directing any money to Fleener, except the $920. However, the jury was the trier of fact and was entitled to disbelieve his testimony. *Fichtner v. Richardson*, 708 S.W.2d 479, 483 (Tex. App.—Dallas 1986, writ ref'd n.r.e.); *First City Bank–Farmers Branch v. Guex*, 659 S.W.2d 734, 739 (Tex.App.—Dallas 1983, no writ).

As with Delaney, the contested issue was whether Fleener had a "substantial interest" in Cross's business affairs. Armed with the jury finding that Fleener received more than ten percent of his gross income from Cross in the twelve months before November 12, 1985, we conclude that Fleener had a substantial interest in Cross's business affairs when he voted to approve the Compromise and Settlement Agreement. The motion approving the Agreement could not have carried without Fleener's affirmative vote. Consequently, Fleener's vote, like Delaney's, made the Agreement voidable by the District, unless some other law suspended the operation of the then prevailing conflict-of-interest statute. Act of May 30, 1983, 68th Leg., R.S. ch. 640, § 6, 1983 Tex.Gen.Laws 4079, 4081.

## VIOLATION OF OPEN MEETING ACT

■ We now address the District's eighth argument, that the manner of the Board's acquisition of the 4.611–acre easement violated the Texas Open Meetings Act. TEX.REV.CIV.STAT.ANN. art. 6252–17, § 3A(a) and (h) (Vernon 1970 & Supp.1991). The statute requires that meetings of governmental agencies be open to the public. A specific exception allows for certain transactions, including real estate transactions, to be negotiated in closed executive session. TEX.REV.CIV.STAT.ANN. art. 6252–17, § 2(f) (Vernon 1970 & Supp.1991). However, the statute prohibits making final decisions in closed session:

> Whenever any deliberation or any portion of a meeting are closed to the public as permitted by this Act, no final action, decision, or vote with regard to any matter considered in the closed meeting shall be made except in a meeting which is open to the public and in compliance with [the notice requirements] of this Act.

TEX.REV.CIV.STAT.ANN. art. 6252–17, § 2(*l*) (Vernon 1970 & Supp.1991). Actions taken by a governmental body in violation of the Open Meetings Act are subject to judicial invalidation. *Lower Colorado River Auth. v. City of San Marcos*, 523 S.W.2d 641, 646 (Tex.1975); *City of Fort Worth v. Groves*, 746 S.W.2d 907, 914 (Tex.App.—Fort Worth 1988, no writ).

■ The District alleged in the trial court and urges on appeal that the Board's action to acquire the 4.611–acre easement from Cross in August 1985, violated article 6252–17 and is therefore subject to invalidation. The District submitted a special issue to the jury. It asked if the Board's action violated article 6252–17. The jury found a violation. We agree with the District and the jury.

A letter from the District to Cross, dated August 29, 1985, and signed by Delaney recites:

> The Board of Directors today agreed on a proposal to you whereby the Temporary Construction Easement on your 11.-8927 acres dated July 16, 1984, be exchanged for a Permanent Easement on the 4.611 acre tract in the described tract. The consideration proposed is payment of damages in the amount of $239,-580.00 and a trade for a piece of property, somewhere within the District, of approximately 3.5 acres.

A partial seller's statement from Safeco Land Title Company, dated August 29, 1985, reflects the conveyance of a 4.611–acre easement from Cross to the District at a sale price of $239,580 and other valuable consideration. The District gave the title company a check for $239,580, dated August 27, 1985. Cross received the check no later than August 29, 1985. Helen Carr, secretary-treasurer of the Board at the

time of trial, testified that she examined the Board's minutes for the late August 1985 period. She testified that the minutes showed that the Board held an open meeting on August 27, 1985, continued the meeting in executive session on August 28, 1985, and then reconvened in open session on August 29, 1985. Carr testified that none of the minutes mentioned the 4.611-acre easement acquisition or the payment of the $239,580 purchase price. Cross does not challenge the accuracy of her testimony.

The statute permitted the District to negotiate the acquisition of the easement in closed session. TEX.REV.CIV.STAT.ANN. art. 6252–17, § 2(f) (Vernon 1970 & Supp.1991). The statute prohibited taking final action in a closed session. TEX.REV.CIV.STAT.ANN. art. 6252–17, § 2(l) (Vernon 1970 & Supp. 1991). The jury had before it: Delaney's letter, the partial seller's statement, a copy of the cancelled check for $239,580, and Carr's testimony that no reference to the transaction and no vote approving it appeared in the Board's minutes book for the August 1985 period. We conclude that the jury had ample evidence to find that the Board took final action on the 4.611–acre easement purchase in a closed meeting. TEX.REV.CIV.STAT.ANN. art. 6252–17, § 2(l) (Vernon 1970 & Supp.1991).

Cross argues in response that the November 12, 1985 vote approving the Compromise and Settlement Agreement ratified the August transaction and cured any prior violation of article 6252–17. The November 12, 1985 minutes reflect that the public Board meeting recessed into executive session at 6:45 p.m. The Board reconvened in open session at 8:20 p.m., and Fleener moved that the Board approve the matters discussed in executive session. His motion recited that the Board had discussed in executive session the August 1985 acquisition of a 4.1–acre easement[6] from Cross and the payment to Cross of $239,580. According to Fleener's motion, the Board had also discussed the purchase of the 8.233-acre easement. Fleener's motion passed 3–

0. Cross contends that the November 12, 1985 vote complied with the requirements of article 6252–17 and superceded the August 28–29, 1985 transaction. Cross urges that, unless the November 12, 1985 meeting also violated article 6252–17, any statutory deficiencies in the August transaction are immaterial.

■ Cross overstates the legal effect of ratification. A governmental body that has violated the Open Meetings Act may meet again in a proceeding that complies with the Open Meetings Act and reauthorize actions that it previously authorized at the invalid meeting. *Smith County v. Thornton*, 726 S.W.2d 2, 3 (Tex.1986); *City of Bells v. Greater Texoma Util. Auth.*, 790 S.W.2d 6, 11 (Tex.App.—Dallas 1990, writ denied). However, ratification does not have retroactive effect. *Lower Colorado River Auth.*, 523 S.W.2d at 646–47; *City of Bells*, 790 S.W.2d at 11. The facts of *Lower Colorado River Authority* illustrate the distinction. The LCRA is a governmental body and a public utility. It held a meeting in 1972 to raise electric rates. The meeting failed to comply with the Open Meetings Act. The LCRA board met again in 1973 to set future electric rates and to ratify the decision it made at the invalid meeting in 1972. The 1973 meeting complied with the requirements of article 6252–17. The City of San Marcos challenged both rate increases. The Texas Supreme Court held that the rates set at the 1973 meeting, which complied with the Open Meetings Act, were valid but that the rates set at the 1972 meeting were invalid. The LCRA could not retroactively ratify decisions made at an illegal meeting. *Lower Colorado River Auth.*, 523 S.W.2d at 646–47.

■ We apply the principles enunciated in *Lower Colorado River Authority* and *Smith County* to our case. The Board voted to buy the 4.611–acre easement from Cross at a meeting that violated article 6252–17. The Board could have ratified the transaction by reauthorizing it at a valid meeting at any point between the illegal meeting and the time when the Dis-

---

**6.** Fleener was referring to the 4.611–acre easement. Either Fleener misspoke in the meeting, or the reference in the minutes to a 4.1–acre easement is a typographical error.

trict accepted the conveyance and paid the purchase price. Once the District paid Cross the $239,580, the transaction was complete. Any subsequent "ratification" would have been retroactive. We hold that, on November 12, 1985, the Board had no power to ratify the August transaction. That transaction is voidable by the District. At a future meeting, which complies with article 6252-17, the District may again authorize acquisition of an easement over the 4.611 acres.

## ESTOPPEL

■ Cross argued in the trial court that the District had enjoyed the benefits of using his land and therefore should be equitably estopped to deny the enforceability of the Agreement and the promissory notes. Cross submitted his argument to the jury in the form of a special issue. The jury found that the District was estopped to deny its liability to Cross. The trial judge apparently relied on the jury's finding of estoppel in granting judgment to Cross. Otherwise, he could not have ignored without explanation the jury's answers to the special issues on statutory conflict of interest and the Open Meetings Act. On appeal, the District asserts that, as a governmental unit, it is not subject to estoppel, and that even if it were, there is no evidence of the facts necessary to support an estoppel.

■ As a general rule, the doctrine of equitable estoppel does not apply against a unit of government exercising its public or governmental functions. *City of Hutchins v. Prasifka*, 450 S.W.2d 829, 835 (Tex.1970); *Clear Lake City Water Auth. v. Winograd*, 695 S.W.2d 632, 640 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Courts recognize an exception where no governmental function is impaired and an estoppel is necessary to prevent injustice. *Roberts v. Haltom City*, 543 S.W.2d 75, 80 (Tex.1976); *Clear Lake Water Auth.*, 695 S.W.2d at 640. The District is a governmental unit, organized by the Texas Legislature. The District's governmental function is the construction of reclamation and flood control projects.

The District must acquire easements to carry out its governmental function. This lawsuit arises from a dispute over the acquisition of easements. We hold that the suit involves the exercise of a governmental function. The Agreement, if enforced, would cost the District a great deal of money. However, enforcement would create no legal barrier to the future construction of water control projects or to future acquisition of easements. The fact that enforcement of the Agreement would cost money may not be a sufficient basis for holding that recognition of estoppel would impair a governmental function. Assuming without deciding that the application of equitable estoppel against the District would not impair the exercise of its governmental function, we must determine whether an estoppel is necessary to prevent injustice to Cross. *Roberts*, 543 S.W.2d at 80.

■ In the context of equitable estoppel, a party does not suffer "injustice" merely because he fails to receive all the benefits to which he feels entitled. "Injustice" requires some inequitable conduct by the party sought to be estopped. *Muller v. Leyendecker*, 697 S.W.2d 668, 675 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.); *Brooks Fashion Stores, Inc. v. Northpark Nat'l Bank*, 689 S.W.2d 937, 945 (Tex. App.—Dallas 1985, no writ). The record reveals no evidence that the District behaved inequitably towards Cross. Cross argues that the Board deceived him, or was at least negligent in November 1985, with regard to the enforceability of the Agreement and the fifty-one promissory notes. If Cross were an ordinary landowner in the District, his argument might deserve consideration. But Cross was the President of the Board that he claims deceived him. The minutes of the November 12, 1985 meeting reflect that he attended the executive session, where the Board negotiated the Agreement, and the open session, where the Board approved it. Cross's attorney was also present at both sessions. Cross was in as good a position to know the facts and the applicable law as any other member of the Board. There is no evidence of deception.

In addition, we see no injustice in refusing to enforce agreements made in violation of the conflict-of-interest statute and of the Open Meetings Act. By enacting those statutes, the Legislature has already made a judgment about the fairness of the covered transactions. Public policy cannot permit the knowing beneficiaries of improper conduct by public officials to assert the public officials' wrongful behavior as a defense in an action to invalidate the illegal transaction. Such an estoppel defense, if recognized, would defeat the purpose of the statutes. The new governing board of any governmental agency could not prevail in a suit to avoid illegal transactions by the previous board. The new board would always be "pre-estopped" by the wrongful acts of its predecessor. We hold that the District is not estopped to deny the enforceability of the Agreement or of the fifty-one promissory notes. We need not address in this opinion the validity of the promissory notes.

## CONCLUSION

We conclude that the jury had sufficient evidence to find that Delaney and Fleener received more than ten percent of their gross income from Cross in the twelve months before they voted to approve the Agreement, which authorized the purchase of the 8.233–acre permanent easement from Cross. Their votes violated the applicable conflict-of-interest statute, and the Agreement could not have been approved without their affirmative votes.

We conclude that the District's acquisition on August 28 or 29, 1985, of the 4.611–acre easement failed to comply with the Open Meetings Act. The violation of the Open Meetings Act rendered the transaction voidable by the District. The Board's attempt on November 12, 1985, to ratify the transaction was ineffective.

We conclude that no evidence exists to support a finding that the District is estopped to deny the enforceability of the Compromise and Settlement Agreement approved by the Board on November 12, 1985. The evidence is conclusive that Cross knew or should have known as much about the transaction as the other members of the Board. We also conclude that public policy bars the knowing beneficiaries of illegal transactions from asserting equitable estoppel in lawsuits seeking to invalidate the transactions. The trial court erred in submitting a special issue on equitable estoppel to the jury and erred in failing to disregard the answer.

The purchases of the 8.233–acre and 4.611–acre permanent easements are voidable by the District. We reverse the judgment of the trial court and render a declaratory judgment that the District may rescind the two permanent easement transactions and recover the purchase prices paid.